# ABRAHAM J. ROCKAFELLOW

## *v.*

# MARY A. H. NEWCOMB.

1. EVIDENCE—*to prove marriage contract — express promise need not be shown.* To prove a contract of marriage an express promise need not be shown. A mutual engagement may be inferred from constant and devoted attentions gladly welcomed, from reciprocal affection, and the interchange of letters expressive of earnest love.

Syllabus. Opinion of the Court.

2. SAME—*admissions.* Admissions of a party are never conclusive against him; and when made for the purpose of effecting a compromise of the matter in dispute, should be excluded as evidence, on the ground of public policy.

3. CHANCERY—*jurisdiction of to decree a reconveyance of land given in consideration of marriage.* Where land is conveyed in consideration of a marriage contract, and the grantee refuses to consummate the marriage, equity will decree a reconveyance. Marriage is a valid consideration for a deed.

4. CONVEYANCE—*undue influence used in obtaining, will avoid the deed.* Undue influence exercised by the grantee over the grantor to obtain a conveyance of real estate, resulting in a benefit to the former and a great disadvantage to the latter, will avoid the deed. As, where it was sought to obtain a reconveyance of land on the ground, as alleged by the complainant, that he executed the deed in consideration of a promise on the part of the defendant to marry him, which the latter refused to fulfill, it was *held*, that although the contract of marriage may not have formed the consideration for the deed, yet the proof showing that the grantee exercised an undue influence over the grantor in obtaining the deed, to the great benefit of the former and the great disadvantage of the latter, by reason of the close and tender intimacy between the parties, visits having been interchanged and loving letters passed between them, and the woman threatening to annul the marriage contract unless the trade was consummated, afforded sufficient grounds upon which to decree a reconveyance.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Messrs. BENNETT & VEEDER, and Mr. IRA O. WILKINSON, for the appellant.

Mr. DANIEL L. SHOREY, for the appellee.

Mr. JUSTICE THORNTON delivered the opinion of the Court:

Appellant filed his bill, in the court below, alleging, in substance, that he and appellee entered into a marriage contract, which she has refused to fulfill; in consideration of which, and induced by urgent and repeated solicitations, and her false

and fraudulent representations, he executed and delivered to her a deed to a tract of land adjoining the city of Chicago, and known as the Hyde Park property in this record; and that appellee conveyed to him some Iowa land, not in consideration of the Hyde Park property; but, as she stated, to relieve her from continued annoyances on the part of her mother, who was constantly importuning her to convey the Iowa land to her brother Henry; that the Iowa land was worth about $700, and the Hyde Park property about $7000; that he tendered her a deed to the Iowa land; and praying that the deed executed by him be set aside, or appellee be compelled to reconvey.

Answer and replication were filed; and upon the hearing the court dismissed the bill.

Does the evidence sustain the allegation of a marriage contract, before, and subsisting at the time of, the exchange of deeds? We think it does. The deeds were executed and exchanged on the 21st of September, 1868.

Appellant testified, that by request of appellee he visited her on the 4th of July, 1868; remained two days; and they talked of marriage. In July again, and in August, he visited her, at her request, when she said she had no objection to the marriage, and had determined to marry him. Mutual visits were interchanged, and a correspondence carried on between them until the 10th of September. At this time she spoke of the trade, and said: "I wish you would make the trade you and Emily have been talking of so long." She wished him to have the Iowa land, to avoid the importunities of her mother in behalf of her brother Henry; that she would keep the deed to the Hyde Park property in her own hands, and not put it on record, and after the marriage both deeds should be destroyed. Thus urged, and upon such promise, he agreed to make the exchange. On the 19th of September he again visited her, and she informed him the deeds were ready. He declined to proceed further. She insisted and urged that, as she had promised not to record the deed, his refusal evinced an entire

want of confidence in her, and the marriage need not be solemnized. He replied that he would execute the deed, upon her promise not to record it. She assented, and the deeds were signed on the 21st of September.

Appellee contradicts these statements to a great extent; and her sister Emily testified that the Iowa land was the consideration for the deed.

He is, however, very strongly corroborated. After she had refused to marry him, he, with his attorney, Mr. Bennett, had an interview with her, and tendered a deed for the Iowa land, and demanded a deed for the Hyde Park property, and said to her: "You know you agreed to keep the deed in your hands and not record it." She replied, "What if I did, and what if I didn't; what are you going to do about it? John Van Arman is my lawyer." Mr. Bennett distinctly recollects this language. In letters from appellee to appellant, in October, she said: "I have never had that deed recorded, though you accuse me, without any reason, of *forgetting my word*." "I have thought you had some regard for me; and that your happiness, in some measure, depended on me." "I feel so sorry on your account, a good deal more than on my own." "Try and forget this, and bestow your affections on another." "Is it possible that you would be willing to give me the place in your family that you proposed, &c." In a letter of appellant to appellee, introduced by her, of date August 31st, he said: "I could not see you often enough, but loved you too well. Now, dear Mary, this is the truth." "Permit me to come down on tomorrow's train, and receive me back to your heart." In one to Emily, dated October 8, he said: "Do you think it advisable for your sister Mary to come into my family? Mary says she loves me, and I think I do her." Mary McCorkle testified that in October, appellee informed her that she had determined to marry appellant. Harsh testified that, in speaking to appellee about the marriage, he said to her, "I thought there was a matrimonial difficulty;" she replied, "I guess that is so."

Mr. Waite, in detailing a conversation with appellant, brought out by appellee, testified that appellant said he made the deed, supposing that he and Mary were to be married; they had been engaged for some time; she said as soon as they were married she would give up the deed; that the best way to quiet her mother was to make him a deed to the Iowa land, and he make a deed to her, so that the transaction would look right.

It seems that Emily Newcomb, sister of appellee, had been negotiating with appellant, about this trade, for more than a year prior to the courtship between the parties, and had failed in the accomplishment of her purpose. She resided in Chicago; appellee and her mother lived in Galesburg. The mother, probably without the knowledge of appellee, obtained the deed and sent it to Emily, who had it recorded. When this was done Emily purchased a part of the lot; she knew its value; owned property near to it; is a prominent actor in the entire transaction; and is a *quasi* real estate dealer in Chicago.

From the whole proof, the Hyde Park property, at time of the trade, was worth five thousand dollars; the Iowa land about seven hundred dollars.

We are satisfied that at the time of the trade there was a subsisting marriage contract between the parties. Their conduct and correspondence can not be explained upon any other hypothesis. The frequent visits; the intimacy for months; the numerous letters; the expressions of endearment, all prove the existence of the relation. An express promise need not be proved. A mutual engagement may be inferred from constant and devoted attentions gladly welcomed, reciprocal affection, and the interchange of letters expressive of earnest love.

What then was the consideration in the deed to the Hyde Park property? What induced its execution? The inequality in the value of the two pieces of property was too great to justify the conclusion that the Iowa land constituted the consideration. There was other cause—other inducement, of a

stronger character. This man, with his fervid passion and strong love, was not well matched against an accomplished woman, in the incipient stage of their engagement. She requests, he demurs; she urges, he yields. The relation between the parties, and the consequent influence of the woman over the man, and the promise not to record the deed, but destroy it after marriage, make the real, the sole, consideration.

A marriage contract, then, was made. It was a contract which was valid and effectual in law. Marriage is a valuable consideration. There is no stronger consideration in law upon which to found a gift or grant. " Marriage contracts do not differ in principle from other species of contracts, where mutual and concurrent acts are to be performed." *Burks* v. *Shaine*, 2 Bibb, 341. The promise to marry formed the consideration for the deed. The refusal to marry destroyed the consideration.

This land is wrongfully withheld from the rightful owner. It is a fraud to retain the property, and not fulfill the contract. Blackstone (3 book of Com. 174) says: "Deforcements may also arise upon the breach of a condition in law, as, if a woman gives land to a man by deed, to the intent that he marry her, and he will not when thereunto required, but continues to hold the land. This is such a fraud on the man's part, that the law will not allow it to divest the woman's right of possession."

The party failing to comply has no right, either in morals or law, to property thus acquired. The contract was sacred, having the sanction of both Divine and human law. The party in default should not be allowed to reap benefits from its violation. This would disregard the long settled principles of equity jurisprudence.

From proper regard for the character of the woman involved in this controversy, we must hold that there was a mutual affection and engagement. Upon the opposite supposition her conduct would be abhorrent, and a trifling with the purest feelings of our nature.

In the negotiation the contest was unequal. A woman can always exercise an undue influence over the man she professes to love. We have no doubt that influence was exerted in this case.

We have examined the evidence in this case carefully, and have arrived at the conclusion that appellant is entitled to a reconveyance of the land.

The decree of the court below is reversed and cause remanded, with instructions to render a decree, that upon a reconveyance of the Iowa land to appellee, she reconvey the Hyde Park property to appellant.

*Decree reversed.*

Upon an application for a rehearing, Mr. JUSTICE THORNTON delivered the following additional opinion of the Court:

Application was made for a rehearing in this case. As it was persistently argued, we have carefully reviewed the evidence.

The objection is made, that all the testimony was not commented upon in the opinion of the court, and the conclusion is deduced that some portion was probably overlooked. It is impracticable, in numerous cases, to refer to all the evidence. Such practice would swell each opinion to almost a volume.

The portion of the testimony to which no allusion was made, was elicited from Mr. Harsh. In detailing a conversation with appellant, he stated: " Mr. Rockafellow was in my room, and I mentioned the matter of a compromise, saying that I heard Miss Newcomb say that he could have his deed back again. He said he did not want it back again, as that was a fair business transaction, and had nothing to do with their marriage; all he wanted of her was to fulfill their engagement. He then told me that they were engaged since the 4th of July, and that she had her wedding suit made and the day had been set."

Admissions are never conclusive. Besides, this admission may have been made to effect a compromise, and if so should have been excluded on the ground of public policy.

This witness had been talking with appellee about the marriage and the deed, and communicated a part of the conversation to appellant. A compromise was spoken of, and then the admission follows. This certainly weakens its force.

There is sufficient evidence to counteract the effect of the admission.

When the matter of the exchange was first talked of between the parties, it was introduced by appellee. She and her sister, Emily, had the deeds prepared. The next interview was on the 19th of September. Appellant then refused to consummate the exchange, and assigned various reasons for his refusal. Her reply was: "If there was not perfect confidence between us, there was no use of any further talk of our marriage." Why was the marriage referred to, if it had nothing to do with the exchange? If they were independent transactions the reference was absurd.

In October, appellant wrote to her, that if she had determined not to marry him she must return the deed, "which was made and given to her on that marriage contract."

At the interview at Knox College, appellant said to her: "You know the understanding on which that deed was made on the marriage contract, and that you agreed to keep the deed, and not let the same go on record."

Bennett, who was present, strictly corroborates appellant. Neither at the time of the interview, nor in her testimony, did appellee deny the version of this conversation, as stated by Bennett and appellant.

If there was no marriage contract previous to the 21st of September, the date of the deed, how can that assumption be reconciled with the language of appellant to appellee, in a letter of the 31st of August, introduced by appellee, in which he says: "I could not see you often enough, but loved you too well. Now, dear Mary, this is the truth. Permit me to come

13—57TH ILL.

back on to-morrow's train, and receive me back to your heart?" This language is fond, and expressive of a very near and dear relation between the parties.

The evidence is somewhat contradictory; the answers of witnesses sometimes evasive and equivocal; but upon a careful review of the whole record, we are satisfied that the contract to marry was the consideration for the deed of appellant.

Even if this were not true, a reconveyance of the property should be compelled. The relation between the parties was of the most confidential character. The sister, Emily, had essayed for years to negotiate the trade, and had failed. Appellant had always refused to consummate it. The courtship began; visits were interchanged; loving letters passed, and a close and tender intimacy had grown up between the parties.

During this state of affairs, appellee mentioned the trade; the fact that Emily had been trying so long to effect it, and requested that it should be perfected. This was assented to, but at a subsequent interview appellant positively declined to carry it out. The woman then felt and knew her power, and exercised it. She replied, "There is no use of further talk of our marriage." This accomplished the object. Appellant yielded and executed the deed.

She had an undue influence over him, and took advantage of the relation between them. That this influence existed, and was exercised to the great benefit of one, and to the great disadvantage of the other, there can be no doubt. There could be no other relation between persons, where a greater influence could be exerted, and an undue purpose more easily achieved.

The situation of the parties with respect to each other; the close intimacy; the loving correspondence; the threat to annul the marriage contract; the great difference in the value of the two pieces of property, all raise the presumption of undue influence.

She worked upon his passions, excited his fears, and alarmed him, by the dread of separation.

The relief to be granted in such case, stands upon a general principle, which applies to all the variety of relations in which dominion may be exercised by one person over another.

The rehearing is denied.

*Rehearing denied.*