BENJAMIN F. TOWNSLEY

v.

JENNIE QUINLAN.

BREACH OF CONTRACT OF MARRIAGE—INSTRUCTIONS.—Instructions that "a mutual engagement may be inferred from constant and devoted attentions gladly welcomed, from reciprocal affection and the interchange of letters expressive of earnest love," and that " evidence of her preparation of marriage and her carrying herself as consenting to and approving his promise, if such evidence has been introduced, would be sufficient to establish a contract of marriage between the parties." *Held*, that the court usurped the province of the jury by telling them what would be sufficient evidence, speci·· fying a few circumstances, some of which were not in evidence, and telling them that such circumstances were alone sufficient to establish the existence of the contract.

APPEAL from the Circuit Court of Mercer county ; the Hon. J. J. GLENN, Judge, presiding.    Opinion filed December 4, 1885.

Mr. JOHN C. PEPPER, for appellant.

Messrs. BASSETT & WHARTON, for appellee.

LACEY, J.    This was an action in assumpsit brought on an alleged marriage contract between appellant and appellee, made on April 23, 1882, and broken in September, 1883, and suit brought by appellee February, 1884.    A trial was had before the court and a jury, and a recovery of $1,500.    There were pleas of general issue and accord and satisfaction.    It appears from the testimony that appellant frequently visited the ap_ pellee from some time in 1879 to October, 1883. · The appellee testified that she promised in 1882 to be appellant's wife, and there was no time fixed for the marriage.    His attentions were increased after that.    That she was sick in 1882, and he called on her; "he said we were going to be married."    That she was sick in Princeton from February until April, 1883, and he called on her there; was very sick.    He was very kind, etc.

Townsley v. Quinlan.

It appears that appellant had been furnishing appellee money during the time he visited her to a considerable amount, some hundreds of dollars. Appellee rested her case without disclosing that she had been improperly intimate with the appellant during the time of their acquaintance.

The appellant then took the stand and testified in substance that during all the time he visited her from November, 1879, to the time she got sick in 1882, he had sexual intercourse with her, and at different places, and that she had even gone with him to Rock Island and Davenport for purposes of assignation, and this intercourse was carried on between them in that way under an understanding that he was to furnish her money from time to time in payment of favors. He produced many letters from her strongly corroborating this theory of the case, which letters, all but one, in which it is admitted in substance that an abortion had been produced upon her in Princeton in February, 1882, at the time she was sick there, she admits to be genuine, and of this letter the evidence as to its genuineness is quite strong. The tone and character of all the letters passing between them seem quite strongly to negative the idea of a marriage contract having existed between them.

Upon the rebuttal the appellee for the first time admitted that improper relations had existed between them, modifying *his* account of it somewhat, and claimed that her consent to the acts of sexual intercourse was procured by appellant under the promise of marriage, and claims increased damages on that account. Appellee admitted that the sexual relations had existed between them from 1881, a considerable time before she claims that any promise was made by appellant to marry her, but avers this intercourse was had with her with the expectation on her part that he would marry her.

We may say that taking the whole evidence together the proof of the existence of a contract of marriage is far from satisfactory.

Under the state of the evidence we think the court below erred in giving instructions Nos. 1, 3 and 7 for the appellee.

The first instruction tells the jury "that a mutual engagement may be inferred from constant and devoted attentions

gladly welcomed, from reciprocal affection and the interchange of letters expressive of earnest love." The third lays down the proposition that "Evidence of her preparation of marriage and her carrying herself as consenting to and approving his promise, if such evidence has been introduced, would be suffi-. cient to establish a contract of marriage between the parties." The seventh holds, that if the jury believe the appellee, through. an implied understanding that the appellant was to marry her, permitted him to have sexual intercourse with her, then the jury should find for appellee and may take such seduction into account in assessing damages, etc., unless she had been guilty of sexual intercourse with other men, etc.

Aside from the instructions calling the attention of the jury to facts not in evidence, such as making preparation of marriage and carrying herself as consenting to and approving his promise and letters expressive of earnest love, etc., the court usurps the province of the jury, by telling them what would be sufficient evidence, specifying a few circumstances, some of which were not in evidence, and telling them that such circumstances were alone sufficient to establish the existence of the contract.

This had a strong tendency to nullify in the minds of the jury all of the appellant's very important testimony and cause the jury to look on the side of the appellee alone. It would lead the jury to believe that such facts being established as set out in those instructions proved the contract as a matter of law, as the court without reference to any of the other evidence in the case told them those facts were sufficient, if established, and by referring to them the jury would naturally infer that there was evidence at least tending to establish them, as the court had called their attention to such supposed facts. An instruction very similar to these given, to be found in the case of Walinsey v. Robinson, 63 Ill. 41, has been condemned by the Supreme Court. In that case the jury were instructed that they might. infer the existence of a marriage contract, 1st, from the conduct of the parties ; 2d, from the circumstances which usually attend an engagement to marry, as visiting, the understanding of friends and relatives, preparation for marriage, and the re-.

ception of the defendant by the family of Sarah Robinson as suitor. The court say in that case "the instruction was too broad; it gives the jury a latitude too great. It by no means follows that because a gentleman is a suitor of a lady, and visits her frequently, that a marriage contract exists between them," and the judgment was reversed for the error in giving that instruction, not more damaging than the above instructions given in this case. The courts recognize the inclination of a jury to strongly lean toward the woman in this class of cases, and guard with care the rights of all parties. It is true that the Supreme Court, in Rockafellow v. Newcomb, 57 Ill. 186, hold this language: "An express promise need not be proved. A mutual engagement may be inferred from constant and devoted attentions gladly welcomed, reciprocal affection, and the interchange of letters expressive of earnest love." But this was said in a suit in equity, where the court was finding and establishing the facts, and the court was saying what might, under certain circumstances, be sufficient to establish such contract, and under the circumstances of that case it *was* sufficient, and it is not doubted that it would be sufficient in many other cases, but it is not always sufficient and is not a matter of law. Then again the seventh instruction was erroneous in being too indefinite, in telling the jury "that if sexual intercourse was obtained with appellee under an implied understanding that appellant was to marry her, the jury should find for appellee, and might take such fact into consideration in assessing damages." The appellee does not claim that there was an existing contract of marriage, only she inferred he would marry her, etc., and submitted to the sexual intercourse in consequence. The jury would be liable to think that this was the implied understanding referred to by the court, which evidently would not be sufficient.

Then, again, the jury were not only to take such fact into consideration in the assessment of damages, but they were to find a verdict on such proof if they thought the facts established a contract not declared on, as this was not. The contract declared on was alleged in the declaration to have been made April 23, 1882, whereas the sexual intercourse first took

place in 1879, according to appellant, and in 1881, according to appellee. The idea that a contract of marriage existed either express or implied prior to or contemporaneously with the first act of sexual intercourse, strongly appears to have been first suggested on the trial, and it was never advanced until the appellee, on rebuttal to the evidence of appellant, brought it forward in justification to the numerous undeniable acts of sexual intercourse had prior to the marriage contract as set out in the declaration.

There might be a case where instructions like the above, if given, would not be held sufficient error to reverse; but in a case like this, where the evidence is not strong, we feel bound to reverse, because the instructions in themselves are erroneous and probably misled the jury. We find no error in the refusal by the court to give the second refused instruction offered by appellant.

For the reasons above set forth the judgment is reversed and cause remanded

Reversed and remanded.