## MELDRUM v. MELDRUM.

1. FRAUD — COURTS NOT CONTROLLED BY SPECIFIC RULES OF PRACTICE.— Courts have not undertaken to lay down any specific and definite rules in regard to fraud by which in all cases they will be controlled in giving relief.

2. APPLICATION OF EQUITABLE PRINCIPLES.— Equitable principles can be applied to every case of fraud as it occurs, however new it may be in its circumstances.

3. HUSBAND AND WIFE — EQUITY WILL RELIEVE AGAINST UNJUST ADVANTAGE.— The relationship of husband and wife is one of special confidence and trust, requiring the utmost good faith and frankness in their dealings with each other; and where either one is false to the other, and fraudulently or through coercion procures an unjust advantage, chancery may relieve against the transaction.

4. DIVORCE — CROSS-COMPLAINT — RESTORATION OF PROPERTY.— Where the wife, while harboring a determination to abandon her husband and dissolve the marital relation, fraudulently procures from him valuable property as a home for the family, and afterwards institutes proceedings for a divorce, equity may restore the title to the husband after a decree of divorce has been granted upon his cross-complaint.

5. FAILURE TO CLAIM PROPERTY IN DIVORCE PROCEEDING.— The fact that the husband did not, in such cross-complaint, make claim for the property so conveyed, will not defeat the subsequent action therefor based upon the fraud, the amount involved being beyond the jurisdiction of the court granting the divorce.

6. ACTION FOR ALIMONY.— The wife alone can maintain an action for alimony.

*Appeal from District Court of Arapahoe County.*

APPELLEE, Andrew Meldrum, was married to appellant, Mary, upon the 3d day of December, 1884, in the county of Delta, in this state. At the time of the marriage appellant was possessed of no estate whatever. Appellee, however, was then possessed of both real and personal property, his total resources amounting to about $50,000. A ranch in Delta county and an interest in the Guston mine, situate in Ouray county, constituted the bulk of his property. Plaintiff and defendant lived together as husband and wife about fifteen months, during which time plaintiff gave to the defendant a large amount of property and money. The larger of these gifts consisted of a ranch in Delta county, valued at $7,500, certain Denver property, which cost about $12,000, and various gifts of money, the last one being $2,000 in cash.

In this action appellee, Andrew Meldrum, after a final decree of divorce from appellant, Mary, seeks to recover from her the real property which he had voluntarily conveyed or caused to be conveyed to her as gifts during the existence of the marital relation and while they were living together as husband and wife. The grounds of the action, as set forth in the complaint, are undue influence, misrepresentation, deceit and fraud on the part of appellant in procuring such property to be conveyed to her.

Appellant in her answer "admits that on or about the 3d day of October, 1885, plaintiff, moved by the solicitations of the said defendant thereunto, and by defendant's professions and protestations of great affection and regard for plaintiff, and in full confidence in the truth of said professions, and upon consideration solely of plaintiff's affection for the said defendant, and of plaintiff's confidence, belief and anticipations that defendant would continue to reside and cohabit with plaintiff during their joint lives, and would bear children to plaintiff, and in all things continue to observe and perform her wifely duties, by deed bearing

date the day and year last aforesaid, conveyed to defendant the land situated in Delta county aforesaid, with the appurtenances; that the said land, with the improvements thereon, were and are of the value mentioned in said complaint; and that afterwards, and moved by the same considerations (but denies that the same were false professions of affection and regard), the plaintiff gave to defendant the sum of $2,000 in money, and that on or about the 1st day of February, 1886, plaintiff, with other moneys to him belonging, purchased and procured to be conveyed to said defendant certain premises situate in the city of Denver, as described in plaintiff's complaint, and caused the same to be furnished as alleged." And it is further admitted in this answer that " the defendant did urge and solicit plaintiff to donate to her the moneys, goods, lands, furniture, etc., mentioned in the plaintiff's complaint." All the fraudulent conduct charged against defendant is denied.

At the trial the district court made certain findings of fact. By the second of these it is found that, at the time of the marriage, appellant was not in love with appellee, but that she married him for a home. By the fourth that, at the time of the conveyance from the plaintiff to the defendant of the property in Delta county, the determination by defendant to abandon the plaintiff had not been formed, and, while plaintiff at that time was repugnant to her, nevertheless she was willing to continue to live with him as his wife. By the sixth it was determined that, after the said conveyance of the Delta county property, and before the conveyance of the Denver property, in February, 1886, the defendant, moved by her repugnance for the plaintiff, determined to abandon him, and cease her wifely relations to him; and she also determined that, before said abandonment occurred, she would, so far as her opportunities might permit, secure from plaintiff, as gifts, all the property she could obtain from him. By the seventh that she did not, before the conveyance of the Denver property, inform the plaintiff of her secretly formed purpose to abandon him;

on the contrary, she permitted him to believe that she loved him; and he had a right to believe, judging from her manner and demeanor, that she loved him, and would continue to live with him as became a dutiful and loving wife. By the eighth, that the conveyance of the Denver property was caused to be made and delivered to her by the plaintiff, moved by his love and affection for defendant; that, had he known of her secretly-formed intention to abandon him, he would not have caused the conveyance to be made and delivered to her. By the ninth, that shortly after the said last-mentioned conveyance was made, defendant, upon a slight provocation, but not at all sufficient, carried her intention of abandonment into execution, and she has not since lived with plaintiff as his wife. Exhibits B and C, referred to in the opinion, are as follows:

Exhibit B. "Denver, Colo., March 1st, 1886. Andy: I am going to write a letter which may seem very hard-hearted in the writer, but I must tell you my feelings. Andy, you know that I do not love you as I should, and that I do not treat you right, and I know that I never can. Now, don't you think it is best to give me a divorce, as long as I want one. If you promise to give me one, I will not sell anything you have given me. If, on the other side, you do not, I will sell the house and go away. I have thought the matter over carefully, and have come to the conclusion that we had better part. When you answer this letter, tell me that you will give me a divorce, and then I will not sell the house. If you do not give me one, I shall sell the house, as I have a chance, and go away. POLLY.

" P. S. If you give me a divorce, in three months after, if you care for me, and I care for you, I will marry you again. I do not care for any one any more than I do for you. The lawyers said that no one need know anything about it unless you wished it."

Exhibit C. "Denver, Colo., March 1st, '86. Andy: I wrote you a letter about three hours ago, but since then my lawyer has called and advised me what to do. He said that

the easiest way to do was for you to come here and say, in the presence of Richard, or any one, that you are going to leave the state for good, and bid me good-by. Now, Andy, that is a very easy way to get a divorce, and will not cost much; but, if you do not do that, he will do another way, which will cost you all the money you have, and all the money I have, and besides that, it will give us both a bad name. Now, I do not want that, but if you do not do what I asked you to do in the commencement of this letter, I shall be compelled to do that; but if you do come, I will not have to sell my house, and I will give you the house and ranch in Delta; and, after we are divorced, if you care for me, and I care for you, we will marry again. Now, Andy, the best thing for you to do is to come to Denver right away, and say those few words. Of course you do not need to leave the state; only tell some one that you are. If you come, it will not cost more than one hundred dollars ($100), and any other way it will cost all we both have, and I am going to get one if it costs all I have. The lawyer says that I can get one a good many ways, but this is the easiest way, and that no one will know anything about it no more than if we were still man and wife. Neither one of us will have to go to court. You have only to say that to Richard, and then go back to Delta. This is very easy, and, as long as I am determined to have one, it is the best to do it in the quietest way, and the cheapest way, also. If you do not come right away, I will enter suit the other way that I told you about. POLLY." [Written on the margin:] "Do not say anything about this to pa, or any one else, and then no one will know anything about it. If you give me a divorce I will promise you that I will marry no one else unless it is you, if you want me, and that I will not sell the house."

By the decree of the district court the title to the property in Delta county, which was conveyed to appellant during the first year of their married life, and before the determination to abandon her husband was shown to have

been formed, was confirmed in her, but the title to the property conveyed to her shortly prior to their separation, and after she had determined to abandon him, was restored to the husband.

Messrs. PATTERSON & THOMAS, for appellant.

Messrs. WELLS, McNEAL & TAYLOR, for appellee.

MR. JUSTICE HAYT delivered the opinion of the court.

It standing admitted by the pleadings that appellant did procure a large amount of property from her husband as the result of her solicitation, our review will first be directed to the evidence of her fraud in so doing. It is in testimony that, to at least four people, appellant expressed her intention to get away with appellee's money. The witness, William Robinson, testified that she told him that she did not want to live where she was; that she was going to marry Meldrum and get some money out of him. A few months after the marriage appellant planned a trip to California with her mother, and, just prior to starting, the same witness testified to having overheard a conversation between appellant and her mother, in which the mother said: "Polly, you will have to be careful about Andy, how you talk to him, and behave nicely to him, and get that $10,000 out of him,"— to which appellant replied: "O, you leave it to me. I know how to work him. I'll get all I can out of him, you bet." The same witness, further testifying, said: "On another occasion I met her [appellant] on the street in Delta, and she told me she was going to get $10,000 from Andy, and as soon as she got it she was going to skip." Both Frank and Sarah Hepworth testify to appellant's repeated declarations made just prior to her marriage with appellee, of her love for one Charlie Mitchell, a notorious character, but of her determination to marry Meldrum, for whom she had no affection, in order to get away with his money.

The witness Miss Nettie Goldsmith testifies that in the

latter part of October, or the 1st of November, appellant paid her a visit at her home in Leadville, and that while there she talked quite freely in reference to her hatred of her husband, and her love for Mitchell; that she was going to leave appellee and not live with him any more. Witness also testifies to a conversation between appellant and her mother, in which Mrs. Meldrum said: " Mamma, I can't stand it to live with him [appellee]. I can't wait until February." And her mother said: " Try to love him, and wait until the 1st of February, and then he will get his money. Then you can go to Europe or New York, and you can stay away a year, and send him a divorce, and have a good cry, and that will be the last of it." The witness further testifying details a conversation that she swears she had with appellant a little later in the year at Delta: " I was coming back from town one day and met Polly. She said she was going to leave Andy, and not going to stay with him any more. Said she was going to Mrs. Haas' house, and going to Leadville the next day. I talked to her awhile, but she would not come back. I went back home. Polly came back that night, and she and Andy made up again. He was going up to the mine the next day, and we walked out to the bars with him. Polly took hold of my arm. She said: ' He has gone up to the mine, and after he gets the money I wish to God he would fall down and break his neck.' She says: ' Nettie, I just hate him. I just shiver when he touches me. If he would bring his money home, honest to God I'd rob him and skip.' "

In February, A. D. 1886, appellee sold his interest in the Guston mine. Soon after this the parties came to Denver, appellant's mother, Mrs. Bond, accompanying her daughter to this city. It was at this time that the home in Denver was purchased. The contract of purchase was made on the 13th day of February, but the deed was not delivered until a few days later. In this deed Mrs. Meldrum was made the grantee. In reference to this appellee testifies that

" she wanted to get it in her name, and she asked me if I would not deed it to her. I says, 'you have got one place now, you better let me have this one;' and she said she would give me back the place in Delta, and she wanted this one, and I joked with her, and she thought I was not going to give it to her, and she started to cry about it in the room. Her mother was present, and her mother says, says she: 'What are you crying about, Polly?' 'Well, Andy don't want to deed me that house,' she says, and her mother says: 'Well, he don't say he won't deed it to you;' yet she cried about it, and wept so hard over it, I said, 'All right, I will give it to you;' and I went up to Mr. Berkey's, and told him to make out the deed in her name."

Mrs. Meldrum's version of the transaction is as follows: " We thought we would like to live in Denver; such a beautiful place; and he asked me how I would like it, and I told him I would like it very much. He wanted to know if he should try and buy a home, or should he buy a house, would I like it, should I be contented; and I told him, ' Yes.' We went around and looked at several nice places, and then we decided on this one up here that we have now on Grant avenue, and he asked me how I would like it for that $10,000 that he promised me if he should put the money into the home and give it to me in my name. Would it make any difference to me. Would I rather have the money. I told him it made no difference; so he bought the home. I didn't know the deeds were put in my name till after he came back. He came home, and called me to one side, and I went to the window, and he said: 'Polly, I have bought the house, and I have had the deeds put in your name,' and he said, 'and recorded. Now they are in the recorder's office.'" In another part of her testimony, Mrs. Meldrum admits that, in all their conversations in reference to the purchase of a home, a home for the family was meant.

About the time they became settled in the house, and the day after the carpets were laid, and the last of the furniture put in place, appellant, making a pretext of some

slight disagreement with appellee about the use of a horse and buggy which he had purchased for her recreation and amusement, drove appellee out of the house, and notified him of her intention to apply for a divorce. After this episode, appellee, at the request of appellant and her mother, departed for Delta. The testimony leaves no doubt that at this time appellee still clung to the hope that his wife would not attempt to carry out her foolish threat of obtaining a divorce, but in this he was soon undeceived by receiving the two communications from his wife, marked "Exhibits B and C." By these letters it appears that, despite all her efforts upon the witness stand to show a valid excuse for applying for a divorce, there did not exist in fact the remotest legal cause in her behalf for a dissolution of the marital vows. One cannot read the evidence without being impressed with the conviction that appellant had long before determined to force a separation from her husband, first receiving from him the largest portion of his estate that he could, by threats, entreaty and dissimulation, be induced to make over to her. And, in carrying out such determination, she seems to have secured the assistance of a lawyer who had as little regard for the principles that should actuate members of the profession as the conduct of Mrs. Meldrum shows she entertained for her marital vows. It is a matter of justice to state that none of the attorneys of record in this suit were at that time employed by Mrs. Meldrum.

The plot outlined in the letters of March 1st was promptly followed up by the appellant commencing proceedings in the county court for a divorce. In this action she caused a summons to be issued for her husband; and, to procure an order for service upon him by publication, she falsely swore that he had departed from the state with no intention of returning. Appellee, finding that it was useless to hope for a reconciliation with his wife, filed an answer denying the charges contained in appellant's petition, and a cross-complaint, upon which judgment was afterwards en-

tered in his favor, dissolving the bonds of matrimony with appellant.

We cannot review all the testimony set out in the three hundred and forty-six pages of the printed abstract in this case, but have endeavored to quote sufficient therefrom to demonstrate that the findings of the trial court find ample support in the evidence. There can be no doubt, in view of the evidence, that the court was justified in concluding that the conveyance of this property was procured by appellant suppressing from appellee her aversion and determination to abandon him, while simulating an affection that did not exist. Appellant admits upon the stand that the property was conveyed to her as a home for the family. That it was a fraud to procure the conveyance, under the circumstances, at a time when she had determined that she would not live with him, cannot be doubted. Whether it is such a fraud as courts of equity can lay hold of, and relieve the injured party from its result, is a more difficult question. The case is a novel one, but we think it can be determined upon well-settled principles of law. That no parallel case can be found need not necessarily be taken as conclusive against the decree of the trial court. Courts have never yet undertaken to lay down any specific and definite rules in regard to fraud, by which, in all cases, they will be controlled in giving relief, as said by Lord Hardwicke: "Fraud is infinite, and, were courts of equity once to lay down rules how far they would go, and no further, in extending the relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped and perpetually eluded by new schemes which the fertility of man's invention would contrive." Parkes, Hist. Ch. 508. In commenting upon this language of Lord Hardwicke, Mr. Perry, in his excellent work upon Trusts, says, at page 197:

"Although courts of equity have not made general definitions stating what is fraud and what is not, they have not hesitated to lay down broad and comprehensive principles of remedial justice, and to apply these principles in favor of

innocent parties suffering from the fraud of others. These principles, though firm and inflexible, are yet so plastic that they can be applied to every case of fraud as it occurs, however new it may be in its circumstances. * * * In investigating allegations of fraud, courts of equity disregard mere technicalities and artificial rules, and look only at the general characteristics of the case, and go at once to its essential morality and merit."

The dominant influence which a woman may acquire over a man, even before marriage, is well illustrated in the case of *Rockafellow v. Newcomb*, 57 Ill. 186. Rockafellow, while engaged to Miss Newcomb, conveyed to her real estate valued at about $5,000, and she conveyed to him property worth $700. The transaction was, however, found not to be an exchange of property, though she claimed that it was. Upon Miss Newcomb's refusal to marry him, Rockafellow brought suit to compel a reconveyance of the property. The supreme court, reversing the judgment of the court below, decided that the contract for marriage was the real consideration for the conveyance, and that such a contract was valid and binding in law. In setting aside the conveyance the court said: " The party failing to comply has no right either in morals or law to property thus acquired. The contract was sacred, having the sanction of both divine and human law. The party in default should not be allowed to reap benefits from its violation. This would disregard the long-settled principles of equity jurisprudence."

It being urged upon the petition for a rehearing that the contract to marry was not the consideration for the deed, the court held that, if this were true, it would not change the result; that the relation between the parties was of the most confidential character, and that the woman took advantage of her power, and exercised an undue influence in procuring the execution of the deed; that, even if there was an exchange of property, the appellant might repudiate the same, because of the influence exercised by Miss Newcomb to her great advantage, and to his great disadvantage.

The court based the relief in such cases upon the general principle " which applies to all the variety of relations in which dominion may be exercised by one person over another." This principle has been applied in many cases in rescuing unfortunate wives from the result of conveyances to their husbands, induced by the latter's fraud, and we see no reason, under our statute emancipating married women from the disabilities of coverture, for not applying it to conveyances to the wife procured by her fraud. The relationship of husband and wife is one of special confidence and trust, requiring the utmost good faith and frankness in their dealings with each other. "Where either one is false to the other, and fraudulently or through coercion procures an unjust advantage, chancery will relieve against the transaction." Schouler, Husb. & Wife, § 403.

In *Stone v. Wood*, 85 Ill. 603, it was held, at the suit of the husband, that a deed, procured by the fraud of the wife to be made to a third party for her benefit, would be set aside in equity. And the court said: "Where either husband or wife becomes untrue to the other, and by fraud obtains an unjust advantage over the other, a court of equity will as readily afford relief as it will between other persons not occupying that relation." In *Haydock v. Haydock*, 34 N. J. Eq. 570, gifts made by the husband, while sick, to the wife, were set aside at the suit of the executors of the husband's estate after his death, because of the undue influence exercised by the latter over the former in procuring the same, the court, in the course of the opinion, using this language:

" The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward, or husband and wife exists, but in every instance where the relation between donor and donee is one in which the latter has acquired a dominant position. The parent by age may come under the sway of his children. *Highberger v. Stiffler*, 21 Md. 338. And so, as in the present case, the husband may become the de-

pendent of the wife, and their natural position become reversed."

Mr. Kerr, in his work on Fraud and Mistake, at page 183, says:

" The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation can be shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one man over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed."

The evidence leaves no doubt of the fraud practiced by Mrs. Meldrum upon her husband. After she had determined to abandon him and procure a divorce, with her mind fully bent upon carrying out such purpose, concealing from him her real intention, he was induced by false professions of love and affection to cause the conveyance of the Denver property to be made to her as a home for the family. Appellant's original purpose is made plain by her subsequent conduct. As soon as the deed was recorded, she threw off the mask, ordered her husband out of the newly-purchased home, and proceeded to break up the family. That appellee acted foolishly will not be denied. He, with his strong passion and ardent love, was not able to cope with her. She, with her deceit and false professions of affection, held complete mastery over him, which she did not fail to exercise to her great benefit, and his great disadvantage. He swears that, had he known of her dislike and determination to abandon him, he would not have consented to the title being placed in her name. She was false to her marital vows, and by fraud procured an unjust advantage of her husband. From such a fraud courts of equity will grant relief, either by setting aside the conveyance or by converting the offending party into a trustee of the property for the benefit of the party defrauded. There is nothing in our statute of frauds to prevent this. In fact,

the statute expressly provides that trusts may either arise or be extinguished by implication or operation of law. Gen. St. § 1516; Browne, St. Frauds (3d ed.), § 84; Perry, Trusts, ch. 6; *Bohm v. Bohm*, 9 Colo. 100; *Sears v. Hicklin*, 13 Colo. 143; *Von Trotha v. Bamberger*, *ante*, p. 1.

And appellee is not precluded by the divorce proceedings in the county court from maintaining this action. There is no question of alimony here. The wife ·alone can maintain such an action. Under no principle of pleading could the husband, under the circumstances, be required to set up in his cross-complaint in divorce proceedings instituted by his wife the facts here relied upon as constituting his cause of action. The value of the property alone would have precluded the county court from entertaining jurisdiction in the premises.

It is contended that appellee is bound under the principle of ratification. There is no finding by the court below upon this question, and if we go to the evidence we find nothing to indicate that appellee, with a full knowledge of all the facts, intended to ratify and confirm the transfer, or that he did anything at any time, with or without such knowledge, to confirm the same. The evidence relied upon to show ratification shows simply that after she had announced her determination to procure a divorce, and when she was complaining of having no ready money to live upon, the husband, still clinging to the hope of a reconciliation, and in pursuance of his usual liberal policy manifested towards his wife, gave her the further sum of $2,000 in cash. Finding no error in the decree of the court below, the judgment will be affirmed.

*Affirmed.*