LEOPOLD BRIXEL

*v.*

MINNA BRIXEL.

*Opinion filed October 23, 1907—Rehearing denied Dec. 6, 1907.*

1. APPEALS AND ERRORS—*when there is no presumption, on appeal, in favor of the decree.* In a chancery case, where the hearing was upon depositions taken before the master, there is no presumption, upon appeal, in favor of the decree; and the findings of the master cannot aid the decree nor supply insufficiencies of the record to sustain it.

2. PARTITION—*when a partition decree cannot be sustained.* A decree ordering partition of the premises described in the bill can not be sustained where the decree is based entirely upon the report of the master, who recommended partition as to a part, only, of the premises described.

3. SAME—*when decree for partition will be reversed on the merits.* A decree, based entirely upon the master's findings from depositions, granting partition between husband and wife at the suit of the latter, will be reversed upon the merits, where it appears from a preponderance of the evidence that whatever interest the wife had in the property was given to her upon her agreement to return to her husband and live peaceably with him, but that she afterwards violated such agreement by again leaving him without cause and filing a bill for divorce.

APPEAL from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

In its original form this was a bill for divorce and for partition of lot 12 and the east two and one-half feet of lot 13, in block 2, in Demarest & Kamerling's Columbian subdivision of the west half of the south-east quarter of section 1, in township 39, north, range 13, east of the third principal meridian. The grounds alleged upon which Minna Brixel predicated her right to a divorce was extreme and repeated cruelty. Leopold Brixel filed his answer, in which he denied all of the material allegations of the original bill,

both as respects the charges upon which the divorce was sought as well as those relating to the right of partition of the premises described. Subsequently the appellee filed an amended bill, eliminating the divorce feature entirely and seeking only a partition of the premises above described. An amended answer was filed, denying all of the substantial averments of the amended bill. Leopold Brixel, appellant herein, then filed a cross-bill, in which it is charged that appellant and appellee are husband and wife and that they were married on the 16th of October, 1902; that in March, 1903, appellee deserted appellant without any reasonable cause and lived separate and apart from him until about the 25th of April, 1903, at which time an agreement was entered into between the parties that if appellee would return and make her home with appellant and live peaceably and harmoniously with him, and discharge the duties of a wife and remain with him as his wife, appellant would give her a writing showing that in case of appellant's death appellee should receive $1000 over and above the amount she would receive by law as his widow; that in pursuance of this agreement appellant executed a judgment note bearing date April 25, 1903, for $1000, payable six months after date, and delivered the same to appellee, and that in compliance with the above agreement appellee returned to appellant's home and remained as his wife and performed her duties as such. It is averred in the cross-bill that appellee was not possessed of any property whatever, real or personal, at the time of the marriage, except her ordinary wearing apparel. The cross-bill charges that appellant was the owner in fee simple of certain real estate in the city of Chicago which he desired to sell; that appellee refused to join in a deed of conveyance of said real estate unless appellant would agree to invest the proceeds thereof in other real estate; that it was then agreed that appellant would re-invest the proceeds of the sale in other real estate, and as an evidence of good faith on his part he agreed to leave the

purchase money (being $3000) with Zuttermeister & Co., which was to be paid by this firm on the purchase of other real estate when appellant and appellee should find something that suited them, and it was agreed that in case appellant died before such re-investment of the $3000 appellee should have said $3000; that appellee then joined with appellant in conveying the real estate which appellant owned at the time of his marriage with appellee. It is charged that appellee repeatedly complained that she was not properly provided for in respect to appellant's property, and that she threatened to desert him and sue him for a divorce unless appellant would agree to purchase real estate and take a conveyance in the names of appellant and appellee; that appellee agreed that if this was done she would be satisfied and contented and would not again desert appellant, but would remain with him as his wife and would not annoy him with divorce proceedings, and would discharge her duties and live in peace and harmony with appellant; that appellant had confidence in appellee's sincerity and believed in her promises, and being desirous of rendering his home life peaceable he then purchased the premises in question in this suit, paying therefor out of his own money $5500,—$2500 in addition to the $3000 which appellant had received for the real estate sold by him,—and that by his direction and in consideration of appellee's promises he directed the deed to be made to appellant and appellee as grantees. It is also averred in the cross-bill that appellee agreed that when the deed was made to her she would then surrender the $1000 note which the appellant had previously given her. It is charged in the cross-bill that appellee, with the design of defrauding appellant out of his property, refused to surrender up the $1000 note, but, on the contrary, while she was still living with appellant as his wife she caused to be entered on said note a judgment by confession in the circuit court of Cook county for $1129.12, which is the same judgment appellee seeks to have satisfied out of appellant's in-

terest in said real estate. It is averred that two days after the entry of this judgment by confession, appellee, without any reasonable or just cause, deserted the appellant and has lived separate and apart from appellant, and has refused, and still does refuse, to return and make her home with appellant. It is charged that the conduct of appellee is in fraud of her agreement and contrary to equity and right in the premises. It is averred that appellee, three days after the entry of the judgment aforesaid, filed a bill for divorce against appellant praying for temporary alimony and solicitor's fees; that said bill for divorce has never been brought to a hearing or otherwise disposed of, and that on January 24, 1906, appellee filed an amended bill praying for partition of the premises described therein, which are the same premises appellant had caused to be conveyed to himself and wife in pursuance of the agreement above set out. Appellant avers that appellee and himself, and appellant's daughter, Fannie Brixel, were living on said premises prior to the date of appellee's desertion last mentioned, and that appellant and his daughter, Fannie, are still living on the premises and that it is appellant's homestead. The cross-bill prays that the confession of judgment may be set aside and declared of no force and effect, and that the deed made to appellant and appellee may be declared void as to appellee and the title vested solely in appellant.

Appellee answered the cross-bill, admitting the marriage but denying substantially all of the other material allegations of the cross-bill. She claims that the $1000 note was given her by her husband as a present. She denies the agreement set out in the cross-bill and that the note should be surrendered when the deed was executed. She claims that the deed was executed to her as a voluntary settlement for her benefit, and not in pursuance of any agreement, as set out in the cross-bill.

The cause was referred to a master in chancery to take the evidence and report his conclusions. Upon the hearing

before the master a large amount of evidence was heard and a finding made in favor of appellee and against appellant. The master recommended a decree for partition of lot 12, above described, but omitted to include the two and one-half feet off the east side of lot 13, which was included in the bill. The description in the decree follows the bill and includes the two and one-half feet of lot 13. The deed is not in the record, and there is no evidence preserved upon which the court's decree for partition of the two and one-half feet on the east side of lot 13 can rest. The cause was tried on exceptions to the finding of the master, which were overruled and the decree entered in accordance with the master's finding.

M. E. AMES, (PARK PHIPPS, of counsel,) for appellant.

ARNOLD TRIPP, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

It is apparent that this decree will have to be reversed if for no other reason than that there is no evidence in the record supporting the decree as to the two and one-half feet off the east side of lot 13. The master finds, from the evidence, that appellee is entitled to a partition of lot 12, and recommends a decree as to that lot. It appears from the abstract and record that appellee's counsel offered in evidence a "deed from Hans G. Thorenson and wife to Leopold Brixel and Minna Brixel, dated September 29, 1903, which being objected to, objection was overruled and deed admitted in evidence and marked 'Complainant's Exhibit 1.' " Upon referring to the record there is no Exhibit 1 to be found, nor is there anywhere any copy of the deed or other evidence identifying the property described in the bill and decree as the premises conveyed by the supposed deed. There is some reference in the parol evidence of Leopold and Minna Brixel to this deed, and it might be that if the

master had found that appellee was entitled to partition of all of the premises described in the bill, the decree could be supported, so far as this point is concerned, by the parol evidence respecting this deed, but we have been unable to find any evidence upon which a decree for partition as to the two and one-half feet can be supported. As already pointed out, the master limited his finding and recommendation to lot 12 and made no finding as to the two and one-half feet. While the decree of the court, based entirely on the evidence in the master's report, found that appellee was entitled to a partition of lot 12 and two and one-half feet off the east side of lot 13, the court clearly erred in decreeing a partition as to the two and one-half feet.

In addition to the errors above pointed out we are not satisfied with this decree on the merits. The principal evidence is given by the parties to the suit and Fannie Brixel, a daughter of appellant. The case was heard upon depositions taken before the master. In such a case there is no presumption, on appeal, in favor of the decree in chancery. The findings of the master are merely advisory, and cannot aid the decree nor supply the insufficiencies of the record to sustain it. (*Baker* v. *Rockabrand,* 118 Ill. 365; *McGinnis* v. *Jacobs,* 147 id. 24; *Kellogg* v. *Peddicord,* 181 id. 22.) The evidence shows that Minna Brixel came to the United States from Baden, Germany, in 1883; that she was married in Germany and left her husband there, who afterwards obtained a divorce from her for her fault. She became acquainted with appellant in 1902 and was married to him October 16 of that year. Appellant had also been married before and by his marriage he had two daughters, one of whom was married and resided in South Dakota; the other, a young lady of twenty-two years of age, resided with her father. It is shown that in January, 1903, appellee was sick and suffered a miscarriage and had to be operated upon. The parties lived together until in March, 1903, when appellee left appellant and went to reside with a Mrs. Wilda.

Appellee claims that she was justified in abandoning appellant on this occasion. The excuse given by the appellee for leaving him is thus given by her when testifying before the master: "Before I married him I was living with Mrs. Wilda at 94 Clybourn avenue. I then went to live with Mr. Brixel on Seventeenth street. I lived with him six months, until April 9, 1903, when I left him and went back to Mrs. Wilda. My husband and his daughter treated me like strangers from the beginning. He ruled the house with his daughter and himself and gave me no money to run the house. Groceries and everything they bought themselves. He called me 'German people' and 'the Dutch one.'" She also says that he refused to give her money and to pay her lodge dues and to buy clothes, and that she then went out of the house. It is admitted that the next day appellant went to see appellee at Mrs. Wilda's and insisted on her returning to his home; that appellant made a number of calls urging appellee to return; that appellee refused to return until it was agreed that the daughter, Fannie, should leave home and go to her sister's, in South Dakota. The appellee said: "If I come back then Fannie will come back to the house again in two or three weeks and then I will have to go out again." It was during appellant's efforts to get appellee to return to his home that he agreed to give her, and did give her, the $1000 note. After the agreement to send the daughter (Fannie) away, appellee refused to return until the daughter left. Appellee contends that appellant refused to properly support her, and mistreated her and suffered his daughter to mistreat her, while, on the other hand, appellant and his daughter expressly deny any mistreatment, and claim that appellee was furnished with sufficient clothing, and that she had money furnished her with which to supply the house with provisions, and that appellee ate at the same table with appellant and his daughter and fared as well as they did. We think that the evidence of appellant and his daughter is more reasonable and more

credible than that of appellee. Appellee's statements that
appellant was seeking to drive appellee out of his house by
mistreatment is inconsistent with appellant's beseeching and
sacrificing efforts to induce her to return. Appellant com-
plied with every condition, however unreasonable or burden-
some, imposed by appellee, to induce her to return to his
house and live peaceably with him as his wife.

Aside from the corroboration of the appellant and his
daughter which is afforded by the acts and conduct of the
parties, appellee's testimony is very much weakened by the
reckless and unexplained contradictions found in her testi-
mony. A few excerpts will show why we think that her
evidence should be scrutinized with great care. In one part
of her testimony she uses the language which we have quoted
above, to the effect that her husband would give her no
money to run the house and no money to buy clothes, and
again she says at another time in her testimony: "When I
wanted money he would fight me every time and say I am
not worth it." Now, contrast the foregoing statements with
the following, taken from appellee's evidence: "One time
he gave me $5, but that was not enough. One time while
I lived with Mr. Brixel I bought myself a brooch. The price
was $28. I had necessary clothes at that time. The $28 I
paid for the brooch I saved out of the household expenses.
Yes, I got the rent from the tenants,— $34 per month. It
was for household and other expenses. During the time I
was away my husband paid me $6 per week. I also took
$90 cash money that I found there in the house belonging
to Mr. Brixel. This was when we were on Cornelia street.
While living on Fourteenth street I also took money of his
a couple of times to buy goods with. The $90 was interest
money, and I took it because I needed it. I told him I took
it. Yes, on another occasion, while living on Cornelia street,
I took over $100 from him. I did not ask him before I
took it but told him afterwards. Besides the things I have
mentioned, I also bought myself a belt, a pocket-book,

combs, underwear, hosiery and gloves.  I considered these things necessities which I needed for my household, and I got them from household money.  I did not use any money for myself.  I bought things I needed in the household, and clothing, shoes, and life insurance, and everything.  Yes, I was in need of clothing during the time I lived with him. Shortly after our marriage I did buy a long black coat.  The coat was broadcloth and lined with satin, and was my bridal present.  This was a couple of weeks after our marriage. There was a winter hat purchased at the same time.  I also bought a silk jacket for street wear.  I bought that after I left him the first time.  I did not buy a spring hat about that time.  I bought that afterwards, with money which he provided me.  Afterwards, when I came back to live with him, I bought a black winter suit, a coat, and a skirt of heavy serge cloth.  This was in the fall of 1903.  I also bought a brown suit,—skirt and waist,—in the spring of 1904.  I bought a rain-storm skirt of heavy gray cloth in the fall of 1903.  Yes, I also bought a blue fancy skirt, brilliantine, light weight.  That was in the summer of 1904. I also bought a black dress and a fancy drop-skirt.  This was ordered from a dress-maker and is the one I have on here.  I bought it in the fall of 1904.  I also bought a long black silk coat in 1905.  It was spring coat.  I also bought a white crocheted cape,—a cheap thing,—to put around my shoulders.  Yes, I also bought a heavy shawl.  I got that summer dress while living with Mr. Brixel.  His money was used in paying for the things I bought.  I also bought material for two shirt waists and two skirts,—cheap gingham,—and made them myself.  I bought a white waist for summer and several white lawn waists,—only one white lawn waist,—and I bought another winter hat and two pairs of shoes.  These articles I have mentioned were all purchased out of money obtained by me from Mr. Brixel; also the breast pin for my Christmas present, which cost $28."

It is apparent from the foregoing admissions of appellee that her statement that her husband refused to provide her with clothing is utterly untrue, and since it appears that appellee was furnished with money for household expenses out of which she was able to save a considerable sum, which she expended for necessaries and ornaments for herself, we are bound to conclude that if she was not supplied with ample food it was because she preferred to cut down household expenses in order that she might gratify her taste for dress. The daughter, Fannie, went away in the spring of 1903 and remained away until November, 1904. Appellant and appellee lived together from the time the daughter left, until in June, 1905. The daughter was away for more than a year and a half, supporting herself during this time by her own efforts. The daughter could not have been the cause of any trouble between the parties while she was away.

Prior to September, 1903, appellant wanted to sell a piece of property on Seventeenth street. Appellee refused to sign the deed until the appellant agreed that the money should be re-invested in other real estate. To this appellant consented under the following agreement:

"This agreement, made July 10, 1903, between Leo Brixel and Minna Brixel, both of Chicago, witnesses: That said Leo Brixel has deposited with H. C. Zuttermeister & Co., of Chicago, $3000, to be held by H. C. Zuttermeister & Co. for the said Leo Brixel until such time as said Leo Brixel shall desire to invest said money in real estate in Chicago, when H. C. Zuttermeister & Co. shall pay the same to the seller of such real estate for Leo Brixel on account of the purchase price thereof. Should, however, the said Leo Brixel die before investing said money in real estate, as aforesaid, then said money shall be paid to said Minna Brixel as her money, free of any charge of creditors of said Leo Brixel.

"The consideration of this agreement is the signing of a deed of certain property to-day sold by said Leo Brixel, by said Minna Brixel, and said money is deposited, as aforesaid, to secure said Minna Brixel in her rights in said property.

MINA BRIXEL, (Seal.)
LEOPOLD BRIXEL. (Seal.)"

"CHICAGO, ILL., *Sept. 30, 1903.*

"Received of H. C. Zuttermeister & Co. the sum of three thousand and 00/000 dollars, being in full satisfaction of all demands to date and for full compliance to the above agreement.

LEO BRIXEL,

MINA BRIXEL,

per Milt H. Allen, her attorney."

After the execution of the foregoing agreement appellant and appellee selected the property in controversy in this suit, on Cornelia street, which was purchased for $5500, which was paid for by appellant, he furnishing $2500 in addition to the $3000 arising from the proceeds of the sale of the property on Seventeenth street. It is said that the deed was taken in the names of both appellant and appellee as grantees, but, as already pointed out, this is not proven by the deed itself. After the property involved in this suit was purchased appellant and appellee moved into one of the flats of said property, the other three being rented for $34 per month. Appellant contends and testifies, and he is corroborated to some extent by his daughter, that the appellee agreed that if appellant would have the deed made to the parties jointly, she would surrender the $1000 note that had been executed to induce her to return to appellant, while appellee testifies that there was no agreement whatever, but that the deed was made to her and her husband jointly to secure her in her rights in his property. In November, 1904, the daughter, Fannie, returned to her father's house and again became a member of his family. It is not shown that appellee made any objections to the daughter's return, and there is no proof whatever of any misconduct on the part of the daughter or mistreatment of appellee, except appellee's own statements. It is apparent from the whole of the evidence of appellee that she has a very bitter feeling against Fannie. Some time before his daughter's return appellee had refused to occupy appellant's bed and each of them occupied separate rooms in the flat. There were only

two bed-rooms in the flat. When the daughter returned appellant surrendered his room to her, and thereafter he was compelled to sleep on a couch in the kitchen while appellee had the best front room alone. Appellee frankly admits that she would not allow appellant to come into her room or to keep any of his clothing therein. His clothing was kept by his daughter in a closet in her bed-room. There was no other place where it could be kept. Based on the fact that appellant was seen by appellee in the daughter's bed-room on one or two occasions, where he had gone to get clothing from her closet in his night dress or only partially dressed, appellee charges that appellant was criminally intimate with his daughter. It is needless to say that this charge seems to be entirely baseless, and the fact that appellee makes it is another evidence of the wanton recklessness that characterizes her evidence. On Sunday, June 4, 1905, appellee dressed herself and said she was going to a birthday party. She went away and never returned. On the next day she filed a bill for divorce against her husband. On June 13 appellee returned to her home with the ostensible object of getting some of her things. She brought with her Emma Phillips and Anna Saunders, manifestly for the purpose of making witnesses of them as to anything that might occur between the appellant and appellee. There was something of an altercation, and appellee and her two witnesses testify that appellant would not allow her to come into the house and pushed her back, placing his hand on her throat. Whatever were the occurences at the house at this time, they do not, in our opinion, affect the merits of this case. The bill for divorce had already been filed and the property rights could not be affected by this transaction.

Taking this whole record into consideration, we are strongly impressed that the decree of the court in this case does appellant a great injustice. In executing this note to his wife, and in causing the deed to be made to her jointly

with himself, there is no doubt that appellant was moved by his desire to satisfy the unreasonable and burdensome demands made by his wife, for the purpose of trying to induce her to live with him as his wife. Appellant was evidently very much attached to appellee, as is shown by the sacrifices that he was willing to make in order to induce her to live with him peaceably. After appellee had gotten as strong a grasp as she could get upon appellant's property she abandoned him, apparently without any justifiable cause, and is now seeking to get the proceeds of the note and the real estate into cash. If she succeeds she will have something like $4000 of appellant's money and appellant will have no wife, notwithstanding all of the appellee's alleged rights in his property were given her on the faith of her promises to carry out her marital duties. This decree ought not to stand, since its effect is to enable appellee to consummate a fraud upon appellant. If appellee had continued to live with appellant and discharged her duties as his wife, or if it had been judicially determined that she was compelled to live separate and apart from him without her fault, she might then have some standing in a court of equity to assert her rights to the judgment and the interest in the real estate. From the evidence in this record, if it were a bill for separate maintenance or divorce the finding must have been against appellee. The views herein expressed are supported by *Hursen* v. *Hursen,* 212 Ill. 377, and cases there cited.

The decree of the circuit court is reversed and the cause remanded to that court, with directions to dismiss the original bill and to enter a decree in accordance with the prayer of the cross-bill.

*Reversed and remanded, with directions.*