## THOMAS v. THOMAS.

No. 325.    Opinion Filed June 7, 1910.

Rehearing Denied January 10, 1911.

(109 Pac. 825.)

1.    DIVORCE—Disposition of "Property"—Gift During Marriage.  A gift of property made during the existence of marriage by a husband to his wife, is not such "property" as is provided for in section 1856, Ind. T. Ann. St. (Mansf. Dig. sec. 2568), wherein it is provided that "in every final judgment for divorce from the bond of matrimony an order shall be made that each party be restored to all property not disposed of at the commencement of the action which either party obtained from and through the other during the marriage and in consideration or by reason thereof."

2.    DIVORCE—Property Rights—Res Judicata.  The statutes in force in the Indian Territory relating to divorce did not vest jurisdiction in the court on a trial of such actions to make final disposition of property rights between the parties; hence, a judgment granting a divorce in which no disposition was made or attempted to be made of certain property rights between the parties was not as to such rights res adjudicata, and the same were subject to determination in a subsequent action brought for that purpose.

3.    DIVORCE—Abuse of Confidential Relation.  Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, or by concealment of material facts, the same result follows, the person so availing himself of his position will not be permitted to retain any advantage gained, although the transaction could not have been impeached if no such confidential relation had existed.  This principle applies to every case where influence is acquired and abused; where confidence is reposed and betrayed.

4.    DIVORCE—Gifts—Failure of Consideration—Adultery of Wife.  A husband, by reason of the trust, affection, and confidence which he had in his wife, had title to certain real estate placed in her name.  He shortly thereafter learned that the wife had prior thereto been guilty of adultery, whereupon they immediately separated and he on this account secured a divorce, and continued in the possession of the property.  She thereafter brought suit therefor; he defended on the equitable grounds arising out of her violation of her marriage vows and the conditions under which the gift was made.  The trial court found

that the wife was not entitled to recover. **Held,** not error; all reasons and consideration supporting the gift having wholly failed in the adultery of the wife.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; R. McMillan, Judge.*

Action by Jesse B. Thomas against John R. Thomas. Judgment for defendant, and plaintiff brings error. Affirmed and remanded.

*Soper, Huckleberry & Owen, J. C. Stone,* and *W. F. Schuermeyer,* for plaintiff in error.

*Preston C. West, W. T. Hutchings,* and *Horace Speed,* for defendant in error.

· No copies of briefs reached the reporter.

DUNN, C. J. On the 10th day of August, 1906, plaintiff in error, as plaintiff below, commenced her action against the defendant in error by filing in the United States Court for the Western district of the Indian Territory, sitting at Muskogee, her complaint at law, in which she prayed for the possession of the property involved in this controversy. An amended complaint was subsequently filed, to which the defendant filed answer. After the issues were finally determined, the cause was heard on an agreed statement of facts on the 15th day of June, 1908, in the district court of Muskogee county, sitting at Muskogee, before Judge R. McMillan, as a special judge.

This agreed statement, omitting the caption and signatures, reads as follows:

"The defendant herein at the time of filing complaint was a resident of Muskogee, in the Western district of the Indian Territory and now Muskogee, Oklahoma; that the land in controversy, to wit: · All of block 174, and being lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 in the city of Muskogee, Indian Territory now Oklahoma, was duly appraised by the Muskogee townsite commission at $300 and was duly scheduled to and in the name of the plaintiff herein, Jessie B. Thomas, according to the official plat thereof as prepared by said Muskogee townsite commission, and approved by

the Secretary of the Interior of the United States, and that thereafter, on the 17th day of August, 1904, a patent was executed and delivered to plaintiff by P. Porter, principal chief of the Creek or Muskogee Nation, as per marked copy attached to plaintiff's amended complaint, marked 'Exhibit A.' That prior to the time said block 174 was appraised and scheduled to the plaintiff herein, the defendant, in ignorance of plaintiff's infidelity, did purchase for this plaintiff for a valuable consideration, from a citizen of the Creek Nation, the possessory right to said block and erected valuable improvements on said block and made an unconditional gift of said block and possessory right to the plaintiff herein, together with all the improvements thereon, including the barn, shade trees, fences and well, and after said gift and the completion of all improvements, both plaintiff and defendant used, had the possession of and occupied said block jointly as husband and wife until the 15th day of August, 1901, the date of their separation, and since said time defendant has had possession of the same. That at the date of the appraising and scheduling of said property to the plaintiff by the Muskogee townsite commission, she was, and had been long prior thereto, the lawful wife of the defendant. The defendant having erected and paid for the improvements upon said block 174 and believing and trusting in the affection, devotion, and fidelity of the plaintiff, who was then his wife, applied himself to the said townsite commission and had said block and the lots composing the same scheduled to his wife. Thereafter he learned of the long-continued infidelity of his wife to him, and on the 26th day of August, 1901, he entered suit in the United States Court in the then Northern district of the Indian Territory at Muskogee, for a divorce from his said wife, the plaintiff herein. That the testimony therein was taken, the allegations of adultery in the complaint proven, and on the 13th day of February, 1902, an absolute divorce was granted to the defendant in this case, from the plaintiff herein, as per decree attached and made a part hereof. The agreement between the United States and the Creek Nation, approved March 1, 1901, has the following provision in section 11 thereof: 'Any person in rightful possession of any town lot having improvements thereon other than temporary buildings, fencing, and tillage, shall have the right to purchase said lot by paying one-half the appraised value thereof.' It is further provided in section 15 of said agreement, that when an appraisement on any town lot is made on which any person had improvements, the appraisement commission

should notify him of the amount of the appraisement and he should
then within sixty days thereafter make payment of 10 per centum
of the amount due for said lot, being 50 per centum of its appraised
value, and four months thereafter, pay 15 per centum additional,
and the remainder in three equal annual installments without in-
terest. It is further provided that taxes might be assessed against
said town lots after they were sold as provided in said agreement,
which should constitute a lien upon the interest of the purchaser
therein after payment thereon had been made. 'That under the
provisions of the agreement entered into, approved March 1, 1901,
as hereinbefore mentioned, the property in controversy being all of
block 174, and appraised at $300, one-half of that amount or $150
was required to be paid by the party to whom it was scheduled,
being Jessie B. Thomas, the plaintiff herein; that the defendant
herein paid 25 per centum of said sum of $150 or $35 and the
plaintiff paid $115 together with interest, making a total of
$118.31. That immediately after the scheduling of said property
to this plaintiff, the same was assessed for taxation by the munici-
pal corporation of Muskogee and defendant has paid all taxes
against said property from said time down to the present; that
defendant stands ready and willing and hereby tenders into court
the amount paid by plaintiff on the appraised value as herein set
forth, together with legal interest from the time of said payment."

On June 27, 1908, the court, after considering the agreed
statement of facts and the complaint and answer of the defendant,
found: That prior to May 25, 1901, the defendant, John R.
Thomas, purchased for the plaintiff, Jessie B. Thomas, who was
then his wife, the possessory right to the land involved, and erec-
ted valuable improvements thereon including barn, shade trees,
fences, and well, paying the entire consideration therefor, and made
a gift thereof to the plaintiff. That he thereafter and prior to
August 15, 1901, had the same listed and scheduled to her and
that "the sole consideration moving the defendant to give said
property to the plaintiff and have the same so scheduled to her was
his belief and trust in the affection and devotion and fidelity of
plaintiff, who was then his wife. That said plaintiff was at the
date of the purchase by defendant of the possessory right to said
block and of the erection of the improvements thereon and at the

time of the gift of the same by the defendant to plaintiff, unfaithful to the defendant and had been unfaithful to him for a long period of time, but that defendant was in entire ignorance of the unfaithfulness of the plaintiff until the 15th day of August, 1901, when he learned for the first time of the long-continued infidelity of his wife and separated from her on that account, and on the 26th day of August, 1901, entered suit in the United States Court in the then Northern district of the Indian Territory at Muskogee, for a divorce from plaintiff herein on the ground of adultery, and an absolute decree of divorce was granted to defendant from plaintiff upon said ground on the 13th day of February, 1902, but no order was made in said decree touching the property rights of said plaintiff and defendant. That from the time defendant purchased said property and erected the improvements thereon until the 15th day of August, 1901, plaintiff and defendant used, had the possession of, and occupied, said block jointly as husband and wife, and that since said date the defendant has paid 25 per centum of $150 required by law to purchase and extinguish the rights of the Creek Nation in the block of land in controversy, amounting to $35, and the plaintiff had paid the sum of $115, or 75 per centum, which, with interest thereon, makes a total of $118.31; that on the 17th day of August, A. D. 1904, a patent for said block of ground was executed and delivered to the plaintiff herein by P. Porter as principal chief of the Creek or Muskogee Nation, conveying to the plaintiff herein the legal title to the block of ground in controversy in this suit. That the defendant has tendered into court the amount paid by plaintiff on the appraised value of said block, to wit: The sum of $118.31. The court doth further find that the entire consideration for said property, excepting the sum of $115, which, with interest, has been tendered into this court, was paid by the defendant herein, and that said block 174 was derived by the plaintiff from the defendant during the subsistence of the marriage, and that defendant is legally entitled to have said property restored to him and is entitled in equity to have a conveyance from the plaintiff of the legal title now standing in her name.    And

judgment was then rendered for the defendant entitling him to recover of and from the plaintiff the legal title to the property' in controversy, and plaintiff was directed to execute and deliver to the defendant a deed conveying all of her right, title, and interest in and to the property, and on her failing to do so the clerk of the court was authorized and empowered to make such deed of conveyance. The defendant was allowed his costs and the plaintiff was allowed to recover $118.31, tendered into the court by the defendant, which covered the amount of money she had paid toward the lot, and which was to be delivered to plaintiff whenever the conveyance ordered had been executed. A motion for new trial was made and overruled, and the case was regularly brought to this court for review.

July 13, 1909, an opinion was prepared and handed down, to which a motion for rehearing was filed, and, after oral argument and exhaustive briefing by industrious and talented counsel, the same is once more before us for our consideration. In the opinion which was then rendered, which is superseded by the present one, we held that section 1456 of the Statutes of Indian Territory (Mansf. Dig. § 2568) did not apply to property obtained as was this, and also that a decree of divorce is a bar to any action by a former husband or wife against the other to enforce any property right growing out of the marital relation. To this extent the law so declared is, under the general rule, correct. The gift from the the husband to the wife did not fall within the terms of the statute referred to. It appears to be conceded by counsel that this statute was taken substantially in its present form from the state of Kentucky as it there existed in the year 1868. The Supreme Court of the state of Arkansas seems not to have had occasion at any time to pass directly on and construe it, but it received a construction at the hands of the court of last resort of Kentucky in a number of cases, some of which are cited by counsel for both parties. They are as follows: *Williams v. Gooch* (1861) 60 Ky. 486; *Flood v. Flood* (1868) 68 Ky. 167; *Orr v. Orr* (1871) 71 Ky. 156; *Phillips v. Phillips* (1872) 72 Ky. 183; *Golding v. Golding*

(1884) 82 Ky. 51; *Bayer v. Fusche's Ex'r* (Superior Court, 1886) 7 Ky. Law Rep. 832; *Irwin v. Irwin*, 107 Ky. 24, 52 S. W. 927, 21 Ky. Law Rep. 622. It is a general rule obtaining in practically all jurisdictions that where a divorce action has been finally closed, any property rights between the parties growing out of the marital relation are no longer open to adjudication. *Barnett v. Barnett*, 9 N. M. 205, 50 Pac. 337; *Walker et al. v. Walker et al.*, 150 Ind. 317, 50 N. E. 68. That this rule did not obtain in the Indian Territory at the time of the trial of the divorce action in this case is practically, if not quite, conceded by counsel for plaintiff in error on the rehearing, and is due to the fact that, under the statutes of Arkansas then in force in Indian Territory, a court in granting a divorce had no power to dispose of property rights between the parties, further than to make an order restoring each party to all property not disposed of at the commencement of the action which either party obtained from or through the other during the marriage and in consideration thereof. Such appears to be the holding of the Supreme Court of the state of Arkansas in the case of *Bowman v. Worthington*, 24 Ark. 522, as follows:

"Where by statute jurisdiction over particular subjects of equity is conferred, or given to common-law courts, the entire body of law adminstered in the equity courts of this country attaches; but the subject of divorce and all incidental questions, including alimony and matrimonial cases, are not subjects of equitable jurisdiction; and in such cases the courts have no other power than those expressly conferred by the statute."

The trial court not possessing jurisdiction to entertain the question of the disposition of this property in the divorce proceeding, the same did not become *res adjudicata* by reason of that action, hence is left open for determination in this case.

In one of the supplemental briefs filed by counsel for plaintiff it is contended that the case was tried in the lower court by the parties on the sole theory that defendant, if entitled to recover, was entitled to do so because of the terms of the statute above referred to, and that the equitable defense sought to be set up and

pleaded was not relied on or considered as one of the grounds insisted on by defendant. We have carefully investigated the record on this question and are unable to agree with counsel's contention. As a part of the defense set up in the answer, the defendant stated in substance that plaintiff, long prior to the scheduling of the said property to the plaintiff, was his lawful wife; that he was entitled under the law to have each lot or parcel of land involved scheduled to him, but, believing and trusting in the affection, devotion, and fidelity of his wife, he had the said property scheduled to her, and immediately thereafter he learned of her long-continued infidelity and immediately entered suit for divorce. The agreed statement of facts afterward entered into contains, as is seen, a recognition of this defense. After considering the pleadings and agreed statement of facts before him, the court in rendering its judgment recognized this element as a part of defendant's claims, and both parties in their original briefs in this court briefed this question, and it was not until the supplemental brief referred to on rehearing was filed that the contention was made that the action was tried in the lower court on the sole theory suggested above.

From the agreed statement of facts, the court found, as is seen, that the sole consideration moving the defendant to give the property involved to the plaintiff was his belief and trust in her affection, devotion and fidelity; that she was then his wife, and that he was in entire ignorance of her unfaithfulness to him. It also appears that they remained in the joint possession of the property thus scheduled to the wife until the 15th day of August, 1901, and that since that date the defendant has been in exclusive possession of the same, and the question presented to us under this state of facts is: Can plaintiff now oust defendant, and will a court of law or equity assist her, after having been divorced for her violation of her marriage vows, to recover possession of this property from her husband? On the former hearing of this case there was presented to us for our consideration the case of *Kinzie v. Kinzie,* 115 Mo. 496, 22 S. W. 497, 20 L. R. A. 222, and in passing on this ques-

tion this court followed that case as an authority, and there is no doubt of its being directly in point. On rehearing counsel for both parties have ranged the entire field of law for citation and precedent, and from the overwhelming weight of authority presented to us we have been convinced that the Missouri case, which is without support of any authority cited within it, finds no support in any authority outside of it, and that the rule laid down therein, and which we followed, is not the true one.

In the case of *Holt v. Holt*, 23 Okla. 639, 102 Pac. 187, this court said:

"The union out of which grows the marriage relation is different from every other species of contract into which humanity enters. It is entered into in the eyes of all people for the mutual lives of the parties. None anticipate divorce on entering it. No expectation thereof or arrangement therefor is provided. The union so effected is spoken of as a journey together for life. Out of the relationship grows the family, the most important, single element sustaining modern civilization. Divorce is the death of this sacred relationship. This union and relationship is predicated upon love, affection and confidence, the tenderest ties which bind humanity together. The law of the land and morality enjoins upon the parties loyalty to, and forbearance with, each other. Confidence, reliance and trust are encouraged, and by reason of these conditions the parties are, when one of them proves recreant, most easily imposed upon, overpersuaded and wronged. In order that these necessary conditions out of which a happy fireside clime may evolve shall exist, and confidence and trust be freely bestowed, the law looks with a jealous and watchful eye on contracts between the parties, and guards with a tender solicitude the rights of the weaker when discord enters and dissolution impends. In consequence thereof, the rule is thoroughly established that, wherever such relationship exists, undue influence, or rather the ability to exercise undue influence, is implied by virtue thereof; and, while neither equity nor law denies the possibility of valid transactions between the parties, yet whenever one of the parties obtains a possible benefit from a mutual transaction, equity raises a presumption against its validity, and casts upon the party asserting it the burden of proving affirmatively his compliance with equitable requisites to thereby overcome the presumption; and the court will not

allow any transaction between such parties to stand when assailed, unless there has been the fullest and fairest explanation and communication between them, and absolute good faith and fairness in the party who seeks to establish the contract with the person so trusting him. Pomeroy's Equity Jurisprudence, §§ 955, 956. The principle applies to every case where influence is acquired and abused, where confidence is reposed and betrayed. *Smith v. Kay,* 7 H. L. C. 779. Wald's Pollock on Contracts (3d Ed.) § 600."

Authorities affirming and exemplifying the foregoing principles may be noted as follows: Perry on Trusts (4th Ed.) vol. 1, § 177; 2 Pomeroy's Eq. Juris. (2d Ed.) § 956, p. 1378; 1 Story's Eq. Juris. (13th Ed.) § 218; *Darlington's Appeal,* 86 Pa. 512, 27 Am. Rep. 726; *Kline v. Kline,* 57 Pa. 120, 98 Am. Dec. 206; *Chittenden v. Chittenden,* 22 Ohio Cir. Ct. R. 498; *Robins v. Hope,* 57 Cal. 493; *Brison v. Brison,* 75 Cal. 525, 17 Pac. 689, 7 Am. St. Rep. 189; *Harraway v. Harraway et al.,* 136 Ala. 499, 34 South. 836; *Highberger & Wife et al. v. Stiffler,* 21 Md. 338, 83 Am. Dec. 593; *Sears v. Hicklin,* 13 Colo. 143, 21 Pac. 1022; *Meldrum v. Meldrum,* 15 Colo. 478, 24 Pac. 1083, 11 L. R. A. 65; *Brixel v. Brixel,* 230 Ill. 441, 82 N. E. 651; *Hursen v. Hursen,* 212 Ill. 377, 72 N. E. 391, 103 Am. St. Rep. 230; *Stone v. Wood,* 85 Ill. 603; *Warlick et al. v. White et al.,* 86 N. C. 139, 41 Am. Rep. 453; *Turner v. Turner,* 44 Mo. 535; *Evans v. Evans,* 118 Ga. 890, 45 S. E. 612, 98 Am. St. Rep. 180; *Basye v. Basye,* 152 Ind. 172, 52 N. E. 797; *Dickerson v. Dickerson et al.,* 24 Neb. 530, 39 N. W. 429, 8 Am. St. Rep. 213; *Boyd v. De La Montagnie,* 73 N. Y. 498, 29 Am. Rep. 197.

The rule announced finds its expression in some of the foregoing texts and cases as follows:

"Constructive fraud often exists where the parties to the contract have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other. Wherever, from such relation, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself. A transac-

tion between persons so situated is watched with extreme jealousy and solicitude, and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. Owing to the near connection between the parties, in many relations, the transaction in itself is considered so suspicious as to cast the burden of proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious." (*Darlington's Appeal, supra.*)

"In all cases of *suggesto falsi*, where active steps have been taken to deceive and gain an advantage, courts have little trouble in giving relief; but where an advantage has been gained by concealment, or *suppressio veri*, as it is called, or by mere silence, it is more difficult to lay down fixed rules that may not do more harm than good to business and society. However, concealment, or *suppressio veri*, is often of that fraudulent character that avoids a contract or converts the offending party into a trustee." (Perry on Trusts, *supra.*)

"Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed. Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal." (Pomeroy's Eq. Juris., *supra.*)

"But by far the most comprehensive class of cases of undue concealment arises from some peculiar relation or fiduciary character between the parties. Among this class of cases are to be found those which arise from the relation of * * * husband and wife. * * * In these and the like cases the law, in order to prevent undue advantage from the unlimited confidence, af-

fection or sense of duty which the relation naturally creates, re-
quires the utmost degree of good faith *(uberrima fides)* in all
transactions between the parties.  If there is any misrepresenta-
tion, or any concealment of a material fact, or any just suspicion
of artifice or undue influence, courts of equity will interpose and
pronounce the transaction void, and as far as possible restore the
parties to their original rights.  (Story's Eq. Juris., *supra.*)

The case of *Meldrum v. Meldrum, supra,* was one wherein a
woman married a man for the purpose of despoiling him.  He be-
lieved in her, however, and as evidence of his confidence, conveyed
to her a large amount of property.  On her getting possession
thereof, and having abandoned him, and after an action and judg-
ment for divorce, he brought suit to recover the real property which
he had voluntarily conveyed or caused to be conveyed to her as
gifts during the existence of the marriage relation.  In passing
upon the case, the Supreme Court of Colorado quoted from Kerr on
Fraud and Mistake, at page 183, as follows:

"The principle on which a court of equity acts in relieving
against transactions on the ground of inequality of footing be-
tween the parties is not confined to cases where a fiduciary relation
can be shown to exist, but extends to all the varieties of relations in
which dominion may be exercised by one man over another, and
applies to every case where influence is acquired and abused, or
where confidence is reposed and betrayed."

—And then said:

"The evidence leaves no doubt of the fraud practiced by Mrs.
Meldrum upon her husband.  After she had determined to aban-
don him and procure a divorce, with her mind fully bent upon
carrying out such purpose, concealing from him her real intention,
he was induced by false professions of love and affection to cause
the conveyance of the Denver property to be made to her as a
home for the family.  Appellant's original purpose is made plain
by her subsequent conduct.  As soon as the deed was recorded, she
threw off the mask, ordered her husband out of the newly pur-
chased home, and proceeded to break up the family.  That appellee
acted foolishly will not be denied.  He, with his strong passion
and ardent love, was not able to cope with her.  She, with her de-
ceit and false professions of affection, held complete mastery over
him, which she did not fail to exercise to her great benefit, and

his great disadvantage. He swears that, had he known of her dislike and determination to abandon him, he would not have consented to the title being placed in her name. She was false to her marital vows, and by fraud procured an unjust advantage of her husband. From such a fraud, courts of equity will grant relief, either by setting aside the conveyance or by converting the offending party into a trustee of the property for the benefit of the party defrauded."

The case of *Basye v. Basye, supra,* was one wherein a designing wife had induced her husband to transfer to her certain real property, and thereafter abandoned him and brought suit for divorce. On his bringing action to cancel the deed, the Supreme Court of Indiana, in the consideration of the case, said:

"Appellee owed appellant the utmost good faith and frankness. There existed between them a relation of special confidence and trust. The principle also applies here that whenever the confidence resulting from such a relationship is abused, equity will interfere. (Citing authorities). It was a fraud on appellant for appellee to conceal her intention of abandoning him as soon as she got his property. That the husband is usually the stronger may be true; but that he is not always the dominating force in the marriage union is known from many well authenticated instances extending from the present back to the time of Delilah. A few of these have gotten into the law books."—citing authorities.

The case of *Turner v. Turner, supra,* was one wherein the wife induced the husband by importunities to have the title to certain property placed in her, at which time he had the utmost confidence in her fidelity, love and chastity. At that time, however, she had, unknown to her husband, committed adultery, and it was her intention, after she had the property, to abandon her husband and continue her licentious life with her paramour. The Supreme Court of Missouri, in the consideration of the case, says:

"The petition alleges a state of facts which, if true, shows that the plaintiff has been made the victim of one of the grossest outrages which it is possible for the human mind to conceive of— a deliberate attempt by a faithless wife, in conjunction with her guilty confederates, not only to rob her husband of his peace, and dishonor him, but also to wrest from him all his property. Not satisfied with turning him out in the world smarting under

the sting of a most heinous and grievious wrong, they proceed further in their iniquitous career and reduce him to beggary. A conveyance obtained without sufficient consideration by a person resorting to undue influences, or practicing fraud or deception, will generally be set aside. Fraud and mistake vitiate and avoid a conveyance, without regard to the sources whence they originate or the effect which they produce. * * * A wife in whom her husband reposed the strictest confidence might well be calculated to exert an influence on his mind and obtain the title to property in her own name. If it was done with an honest intent, to secure a home for herself and her offspring, the transaction would not only be legal, but praiseworthy. But if the influence was exerted with the design of despoiling the husband and then abandoning him, and sharing the ill-gotten gains with some other person, the law would condemn and stigmatize the transaction."

The case of *Stone v. Wood, supra*, was one wherein the wife induced the husband to convey to her certain real property which she in turn conveyed to another. The evidence showed that at that time the wife had been untrue to the husband and the husband brought suit to recover his property. The Supreme Court of the state of Illinois, in a case restoring plaintiff his property, said:

"There can be no doubt that a man may have relief from such frauds as this, in equity, against his wife. So may the wife against the husband. There is nothing in the marriage relation that can prohibit it. If it were not so, there would be a wrong without a remedy. That courts are seldom called on in such cases, does not militate against the rule. It is a fraud that is not sanctified by that relation. When either party becomes untrue to his or her vows and marital duties, and by fraud obtains an unjust advantage of the other, equity will as readily afford relief as it will between other persons not occupying that relation."

The case of *Brixel v. Brixel, supra*, likewise presents a case wherein a wife induced the husband to place title in her to certain property. After getting possession of her husband's property she abandoned him. He sued to recover the same, and the Supreme Court of Illinois, dealing with this situation, said:

"After appellee had gotten as strong a grasp as she could get upon appellant's property she abandoned him, apparently without

any justifiable cause, and is now seeking to get the proceeds of the note and the real estate into cash. If she succeeds she will have something like $4,000 of appellant's money and appellant will have no wife, notwithstanding all of the appellee's alleged rights in his property were given her on the faith of her promise to carry out her marital duties. This decree ought not to stand, since its effect is to enable appellee to consummate a fraud upon appellant. If appellee had continued to live with appellant and discharged her duties as his wife, or if it had been judicially determined that she was compelled to live separate and apart from him without her fault, she might then have some standing in a court of equity to assert her rights to the judgment and the interest in the real estate."

The case of *Evans v. Evans, supra,* was one wherein the husband, on his wife's earnest solicitation, placed the title to certain property which he bought in her. At the time this was done the wife had been guilty of adultery without the husband's knowledge. In holding that the husband was entitled to recover, the Supreme Court of Georgia, in the consideration of this case, said:

"It might with great force be argued that adultery is the most serious of matrimonial offenses; that it poisons the marriage relation, depriving the wife of dower and the right to necessaries (Civil Code, § 4689, par. 6; *Id.,* § 2478); that as it would be insulting and indecent to incorporate in a deed of gift a provision making it void if the wife should be guilty of that crime, the husband must be supposed to have given and the wife to have accepted with the implied condition that the property should not be used for the support of the paramour, or for the maintenance of one who had not only violated the vows under which he had promised to endow her with his worldly goods, but had outraged him as a man, and repudiated him as a husband; that the real consideration of such a conveyance was marriage and the continuance of the married state, which failed when by such an act the relation was rendered intolerable."

The majority of cases between man and wife, where questions arising out of constructive fraud, undue influence, or a violation of confidence reposed, are involved, are generally those wherein the wife sues to secure relief from contracts, gifts and transactions entered into under the influence of the husband; the cases quoted

from above, however, and some others cited, are those where the husband was the victim.    The principle controlling the rule for relief under either situation is the same.    It is that influence has been acquired and abused; confidence reposed and betrayed. It is of no consequence that the one deceived is a man and the other party a woman.    Difference in sex does not create the equities nor alter the rule.    It is the confidential relationship existing between the parties and the fact that the acts done spring from it which creates the equities. In the case at bar it appears that the sole consideration for the transfer of this property from the husband to the wife was the affection and confidence which he had in her as his wife.    She was not a stranger to him, nor did she pay him any valuable consideration for the property.    As he doubtless viewed it, their relationship made them virtually one person, and it was probably a matter of indifference to him whether the title to the property was in her or himself.    They were to jointly use it as a continuing, harmonious family.    He did not give it to her, nor did she receive it in contemplation of divorce and separation; the transaction had its life and being in the sacred relationship of husband and wife.    Without this it would never have taken place.    Had she not occupied the position of wife, but had been a close friend only, and it had been given solely because of the warm, friendly attachment, and then had it been discovered that, prior thereto, she had entered into illicit, sexual relations with another, a court would doubtless not set aside the transaction on this account for the reason that, while the donor might be deceived as to the moral worth of his beneficiary, he would be in no such position to complain as a husband, for she would owe to him no such duty as that owed by a wife, and an entirely different consideration would exist.    In case of such a gift, the property would naturally leave the aggregate estate of the family, in any event, but in the case of a gift to the wife, it would not.    In the wife's adultery the entire foundation and consideration for the gift is swept away and leaves its support void—indeed in this case the consideration was gone, the right to care, affection, confidence,

or even tolerance, every basic consideration, had been destroyed and had no existence when the gift was made. These things failing, the gift failed.

Counsel for plaintiff, referring to the cases from which we have quoted, call attention to the fact that in each of them the gift from the husband to the wife was made on her solicitation. The pleading, the agreed statement of facts, and the judgment in this case are all silent on this point, but for the purpose of dealing with it we will consider this distinction. This for two reasons: First, because they insist this creates a distinction between the cases cited; and second, and primarily, for the reason, if it is of any consequence at all as we view it, the element which this puts into the case most strongly tends to support the judgment of the trial court. So we will assume that there was no solicitation, but that by the wife's concealment and arts, she had so lulled to sleep all doubt of her entire, wifely faithfulness toward her husband that, in his blind devotion, he gladly, and of his own motion, made to her the gift. It appears to us, certainly, that a course of conduct encouraging love, trust and confidence, when but a mere sham, is far more reprehensible than an attitude lacking such hypocrisy and which had no purpose or effect to produce such conditions. The very request upon the head of the family for title to the family estate might, and often would be sufficient to, put on guard a less trusting mate. No such situation existed here—this husband, loving and trusting his wife, intending to provide for her as such, places title to valuable property in her name; she forfeits—had at that time forfeited—all wifely rights, and soon thereafter separates and goes her way. A divorce follows, and to us it is impossible to doubt that in good conscience and morals she should leave behind to the donor the gift so taken. Such is the result under the decrees of practically every court in Christendom, and so say we. To hold otherwise would be to say that the greater the deception, the grosser the moral offense, the more complete the concealment and consequent ignorance of the spouse, the greater the trust, love, affection and confidence reposed, the more

certain, on a gift being made, would be the spoliation óf the injured and the innnocent and the more certain the success of the faithless and undeserving. But from either a legal or an equitable standpoint we are not able to see that it is of much if any con-. sequence whether the wife solicited the title or the husband solicited the privilege—the consequence, the equity, and the result on both parties are the same, and so likewise should be the relief.

From the foregoing it will be seen that the conclusion to which we have come is that the decree of the trial court should be affirmed. This decree provides for the execution of a deed from plaintiff to the defendant and for the return to plaintiff of certain payments which she made upon the property, all of which are affirmed, and the action is remanded to ·the trial court for the purpose of carrying out and enforcing its provisions.

KANE, TURNER and WILLIAMS, JJ., concur; HAYES, J., not sitting.

## On Rehearing.

APPEAL AND ERROR—Petition for Rehearing After Transmission of Mandate—Jurisdiction. Where, after a decision of a case, and rendition of an opinion in this court, its mandate is regularly transmitted to the trial court and is spread upon its records, this court in the absence of fraud, accident, inadvertence, or mistake, is without jurisdiction to recall the mandate and entertain a petition for rehearing, and a motion for leave to file the same will be denied.

(Syllabus by the Court.)

DUNN, C. J. On July 13, 1909, this court rendered an opinion in the above entitled cause to which, within a time extended on application, there was filed, on August 13, 1909, a petition for rehearing which, on December 7, 1909, was granted and the case submitted for oral argument at the January, 1910, term. The case was rebriefed and fully argued, and the former opinion, which reversed the judgment and decree of the trial court, was set aside, and on June 7, 1910, an opinion was rendered affirming the judgment. No petition for rehearing having been filed within the fifteen days

allowed by rule 9 of this court (20 Okla. ix), the mandate in the cause was sent down to the trial court on June 22, 1910, spread upon its records and a judgment entered thereon by that court, June 30, 1910. August 3, 1910, counsel for plaintiff in error filed a motion asking leave to file a petition for rehearing and an order was made purporting to recall the mandate issued. In this condition of the case the court set the same down for briefing and oral argument both on the motion and the merits, and the issues involved have again had the attention of both court and counsel. Our jurisdiction to entertain the action is challenged upon the ground that, after this court has rendered a decision in a cause, and its mandate has gone down under the rules of the court, and is spread upon the records of the trial court, without fraud, accident, inadvertence or mistake, this court loses jurisdiction of the case and cannot entertain an application for a rehearing. This is the first time this question has been raised and presented, or that we have had occasion to investigate it, and, after giving the same our most painstaking care and consideration, we have come to the conclusion that, upon authority and reason, the objection must be sustained. It is manifest that there must be a finality somewhere in all litigation, and the logical point for the appellate jurisdiction to terminate over an action is that time when there is again vested in the trial court jurisdiction to proceed, carry out and enforce any judgment delivered.

A case similar to this is that of *Dempsey v. Billinghurst*, 8 S. D. 86. In the consideration thereof the Supreme Court of South Dakota said:

"Under rule 24, which took effect April 4, 1893, the *remittitur* was held in this court thirty days thereafter, when, no petition for rehearing having been filed, nor any application made for a longer stay of the *remittitur*, the case was regularly remitted to the trial court. Several days thereafter this application to present a petition for a rehearing was filed, the application itself being dated after the *remittitur* and case had gone from this court. Ordinarily, and without a rule on this subject, a petition for rehearing may be made at any time during the term at which the

case is decided, provided the case is still in the appellate court. The purpose of our rule was to avoid retaining the case in this court, to the manifest prejudice of the successful party, an unreasonable time after decision, and at the same time to give both sides ample time to know of the decision, and the grounds upon which it was based, so that either might present his claim for a rehearing. The rule has been in force two and one-half years, and, so far as we know, has been regarded as fair and satisfactory. It is well settled, and, it would seem, could hardly be otherwise in principle, that when the *remittitur* has gone down, without fraud, accident or inadvertence, the appellate court has lost its jurisdiction of the case, and cannot recall it."

Speaking to the same point, the Supreme Court of South Carolina, in the case of *Carpenter v. Lewis,* 65 S. C. 400, said:

"The first question that will be considered is whether this court has jurisdction to entertain the motion to recall the *remittitur*. Section 12 of the Code provides that, 'The Supreme Court may reverse, affirm or modify the judgment, decree or order appealed from, in whole or in part, and as to any or all of the parties, and the judgment shall be remitted to the court below, to be enforced according to law.' In the case of *Sullivan v. Speights,* 14 S. C. 358, the court says: 'Under the rules of this court, when a case is heard here and determined, the *remittitur* to the court below is not sent down immediately, but it is retained in every case for ten days, unless the court direct otherwise. And on application showing sufficient cause, either of the justices, at chambers, may direct by order that it be further retained until the third day of the next session. The object of this is to reserve jurisdiction over the case, so that, should either of the parties desire to make any motion in reference thereto, they might have the opportunity to do so, and the court the power to hear it. After the *remittitur,* however, is sent down, the case passes beyond the reach of the court and its jurisdiction is lost, and no motion can be heard by this court on the matter thereafter.' "

One of the best considered cases confirming our view on this subject is that of *Ott v. Boring,* 131 Wis. 472, in which that court, citing a large number of state and federal authorities, said:

"The question of the period of jurisdiction of purely appellate courts is a somewhat intangible one and not to be decided always upon the same principles and considerations as those which

regulate the jurisdiction of courts of general jurisdiction having the function not only of trial and judgment, but also of execution of the judgment. It seems from an examination of the authorities to be well-nigh unanimously declared that, in the absence of statute making a different provision, the jurisdiction of the appellate court over a given cause terminates whenever regularly, without inadvertence or fraud, it returns the record to the court of general jurisdiction. 2 Ency. of Pl. and Pr. 359, 384; 2 Spelling New Tr. & App. Prac. §§ 733, 734; Hayne New Tr. & App. § 293; *Legg v. Overbaugh*, 4 Wend. (N. Y.)188; cases collected in note, 21 Am. Dec. 118; *Delaplaine v. Borgen*, 7 Hill (N. Y.) 591; *Browder v. McArthur*, 7 Wheat. (U. S.) 58; *Peck v. Sanderson*, 18 How. (U. S.) 42; *Underhill v. Jericho*, 66 Vt. 183, 28 Atl. 879; *Sullivan v. Speights*, 14 S. Car. 358; *Caldwell v. Bruggerman*, 8 Minn. 286; *Dempsey v. Billinghurst*, 7 S. Dak. 564, 64 N. W. Rep. 1124; *Leese v. Clark*, 20 Cal. 387; *Richardson v. Chicago Packing, etc., Co.*, 135 Cal. 311, 67 Pac. 769; *Ward v. Springfield F. & M. Ins. Co.*, 12 Wash. 631, 42 Pac. 119; *State v. Faulds*, 17 Mont. 140, 42 Pac. 285. This apparently rests largely upon the doctrine that when that act is done the jurisdiction of the lower court, which has been suspended meanwhile, becomes reestablished, and that both courts cannot have jurisdiction over the cause. Generally, too, it is held, in the absence of statute, that the power of an appellate court over its judgment, like that of courts generally, persists to the end of the term at which the judgment is rendered, and then absolutely terminates, except as it may be terminated earlier by the retransmission of the cause to the trial court."

The foregoing case may also be found reported in vol. 11, Am. & Eng. Ann. Cases, 857, where it is extensively annotated, cases being cited from nearly if not quite every state in the Union, as well as the federal courts, and the general rule deduced from them all by the author of the annotation is in accord with that we herein announce, and is to the effect that the jurisdiction of an appellate court over a case ceases when it has regularly determined the issues involved and caused its judgment, in conformity with such determination, to be entered, and the case is remanded to the lower court for such action as may be necessary. Among the authorities which we have examined and which have

not been heretofore mentioned, either in this opinion or in the case of *Ott v. Boring, supra,* in support of this rule, may be noted the following: *Horton v. State of Nebraska ex rel. Hayden et al.,* 63 Neb. 34; *Merchants' Nat. Bank v. Greenhood et al.,* 16 Mont. 395, 460; *Merchants' Nat. Bank v. Grunthal, etc.,* 39 Fla. 388; *Rowland v. Kreyenhagen et al.,* 24 Cal. 52; *Trumpler et al. v. Trumpler et al.,* 133 Cal. 248; *Putnam v. Clark et al.,* 35 N. J. Eq. 145; *Bullion Mining Co. v. Croesus Gold and Silver Mining Co.,* 3 Nev. 336; *Finlayson v. Kirby,* 127 N C. 222; *Lubbock v. Vince,* 5 Tex. 415; *Hopkins v. Gilman,* 23 Wis. 512; *Rud v. Board of Com'rs. of Pope County,* 66 Minn. 358, 69 N. W. 886; *Seaboard Air Line Ry. et al. v. Jones,* 119 Ga. 906; *Zorn, Jr., et al. v. Lamar et al.,* 71 Ga. 85; *Phelps v. Davis, etc.,* 25 Ky. 368.

It being manifest that both the appellate and the trial courts can not at the same time have jurisdiction to consider, hear and determine an action, the appellate court must logically, and of necessity, lose jurisdiction when the trial court again secures it, and the trial court acquires jurisdiction to proceed in any action appealed whenever the mandate of the appellate court has regularly reached it and is spread upon its records.

It therefore follows that the motion to be permitted to file the petition for rehearing presented must be denied.

All the Justices concur.