Rosemary LOCKLEY *v.* David Orr LOCKLEY

74-243                                    519 S.W. 2d 52

Opinion delivered February 17, 1975

604

*Burk Dabney*, for appellant.

*Giles Dearing*, for appellee.

CARLETON HARRIS, Chief Justice. This is a divorce case between Rosemary Lockley, appellant herein, and David Orr Lockley, appellee. Questions presented are the validity of property transactions between the two; the jurisdiction of the trial court in entering an *in rem* order as to title to lands located in another state; the granting of a divorce to appellee, and the refusal to grant appellant a divorce on her counterclaim.

Appellee was formerly married to Sedella Lockley (according to the complaint, for more than 40 years)[1], sister of appellant, such marriage being terminated by the death of Sedella on August 17, 1972. There were no living children of the marriage, the only child having died as a baby. Appellant came down for the funeral and returned to her home in Michigan. In January, 1973, appellee went to Leslie Michigan to get appellant who returned to Arkansas with him for the purpose, according to appellant, of helping him take care of his income tax. Rosemary brought with her her 13-year-old daughter, Beverly. Appellant's five other children were left with an older married son.[2] The two were married in

---

[1]The record is confusing in this respect. Appellee testified that he was 55 years of age at the time of trial and that he was married to Sedella for more than 40 years. This, of course, would mean that he was 14 or 15 years of age at the time of this marriage. According to the marriage license, appellee was 60 years of age at the time of his marriage to Rosemary.

[2]Appellant had seven children by her first marriage to Charles Beegle, from whom she was divorced.

February, 1973. Prior to the marriage, two of the younger children came to Arkansas. According to Rosemary, they first separated about two months after the marriage.[3]. She remained away four or five days, but returned at the behest of Mr. Lockley. Thereafter, she again left appellee and on that occasion instituted suit for divorce in the Cross County Chancery Court. Complaint was filed on May 22, 1973. She apparently remained away for about a week before returning to the Lockley home. Lockley owned a farm in Cross County, on which the home is located and on May 31, 1973, this property was conveyed by Lockley to himself and Rosemary as tenants by the entirety. Subsequently, on June 15, 1973, a house was purchased in Leslie, Michigan, the property being conveyed to appellee and appellant as tenants by the entirety. After making the purchase, the parties returned to Arkansas, and Rosemary, after remaining at the Arkansas home for only a few days, left, and returned to Leslie. Thereafter, Lockley instituted the present suit for divorce.[4] Appellant counter-claimed, seeking a divorce and property rights. On trial, after the taking of testimony, the court rendered rather comprehensive findings in which it awarded a divorce to Mr. Lockley on grounds of indignities, rejected the charges (hereinafter discussed) made by Rosemary against appellee, found that appellant had deliberately induced Lockley to place the title to the Cross County property in the parties as tenants by the entirety; found that the same situation existed as to the Michigan property, and the court, in its order, set aside the deed from Lockley to himself and Rosemary to the Cross County property, and vested the title to the home in Michigan in Lockley alone. The court, however, apparently recognized that this last action was of doubtful validity and accordingly an alternative order was also entered giving Lockley a lien against the Michigan property to the full extent of the purchase price. As to personal property, a new automobile, which had been given to Rosemary soon after the marriage, was given to appellant, and appellee was ordered to pay to her the sum of $5,000 in cash. From the decree so entered, appellant brings this appeal. For reversal, four

---

[3]The record in this case is very difficult to follow. Different dates and different months are mentioned as the time of the separation.

[4]Appellant's suit for divorce was dismissed on June 11, four days before the Michigan property was acquired.

points are asserted which we proceed to discuss in the order listed.

## "I.

### THE TRIAL COURT ERRED IN SETTING ASIDE THE DEED FROM THE APPELLEE-HUSBAND TO THE APPELLEE AND THE APPELLANT-WIFE AS AN ESTATE BY THE ENTIRETY TO PROPERTY LOCATED IN CROSS COUNTY, ARKANSAS."

The court rendered its Finding No. 1 as follows:

"1. This case is an outstanding example of the folly of quick marriages, and particularly those which occur shortly after the death of the spouse to whom one of the parties has been married many years. The plaintiff and his former wife had lived together many years, and apparently happily. Shortly after she died, the plaintiff and the sister of the deceased, Rosemary, the defendant herein, established contact, and their marriage took place on February 17, 1973. It was only a short time before Rosemary left, and filed suit for divorce. After persuasion she came back for a short time. During this time she persuaded the plaintiff to place the title to his Cross County farm, which included his home, in both their names. She also persuaded him to withdraw cash from bank accounts in Arkansas, and to purchase with those funds a home in Michigan, title being taken in both their names. Also, the plaintiff bought the defendant a car during this period, as well as gave her cash monies."

Mr. Lockley, who can neither read nor write, other than print his name, testified that appellant was dissatisfied and that she said if the property were placed in their joint names, she could "do better." Appellee stated that his wife said she could handle the business better than he could because of his lack of education; that he realized that he needed help, and he believed what appellant said and relied upon it. He also said that Rosemary told him that the title in both names

would be beneficial as to inheritance tax in that money would be saved and that he believed her and relied upon such information. Mrs. Lockley said that she originally came to Arkansas to help appellee with his income tax, testifying that he stated he would pay her to render such aid. She said that she wrote all the checks for purchases made, and that appellee had total bank accounts of about $68,000 in three different banks; that there were 120 acres in the home property valued at approximately $300.00 per acre, a well-furnished three bedroom brick house with modern conveniences; that the house would be valued at $35,000 or $40,000. Admittedly, all the money mentioned had been acquired by Mr. Lockley. Appellant said she filed the divorce complaint about the time she talked to her daughter Beverly about the actions of Mr. Lockley. According to her testimony, appellee had been making advances toward this 13-year-old girl and he had made various purchases of personal items for the daughter.[5] She said that she had seen him kissing the daughter on the neck but that her husband said "I love her just like a daddy", but this statement did not conform to her daughter's comments. Appellant stated that after talking with Beverly she left her husband and went to her brother's home; that he came and talked with her several times endeavoring to get her to come back to him; that he said if she would come back "he would change everything over." She said that she finally agreed to return, but set out certain conditions.[6] Appellant added that

[5]From the record:
"Before we got married everything — he told me we would stay and he would will the house to Beverly, he would give Beverly the house, everything would go to Beverly. I told him I didn't want it, so it was Beverly. Everywhere he went he took Beverly. He never asked me to go, it was always Beverly and he loved Banana cake and he would come in and ask her first to bake one, he never asked me to. I would go to cook and he would come in and take over. It wasn't because I didn't want to cook, he didn't want me to cook, if he wanted anything done he asked Beverly. He bought for Beverly, he didn't buy for me. Well, I wasn't jealous but it hurt me to think he would do that on her birthday he bought her a cake and an eighty-eight dollar ($88.00) bicycle. When mine came around he bought me a 39¢ pair of house shoes and a box of powder."

[6]From the record:
"Anyway, my agreement when I went back to him was that I had lost all respect for him. 'I don't think I can live with you as a wife because of what you have done.' I said, 'I have not got a cent, I have got no

he told her that he didn't want his people to have the property, "When I die I want you to have it." Within a few days, the deed to the Cross County property was executed.

Appellant's brother, a resident of Cross County, also testified but his testimony added but little to the question now under discussion.

Certainly, we cannot say that the chancellor's finding was against the preponderance of the evidence. It is very apparent that Lockley was almost totally uneducated; that he knew little of business matters; that he recognized and believed his wife was better able to handle such transactions as evidenced by the fact that admittedly she wrote all checks. The testimony from both parties makes it clear that he wanted her to return to live with him. In *Harbour* v. *Harbour*, 103 Ark. 273, 146 S.W. 867, this court stated:

> "If it be true that she married and started in with the deliberate intention to simulate an affection she did not feel for a man much older than herself in order that she might acquire the title to his property and despoil him of it and drive him from the home he had purchased and conveyed to her in his utter reliance upon her affection, loyalty and faithfulness to him, or if she later formed such a design and pursued it with such intention to the consummation proved herein, we do not see why it was not such a fraud against his rights that equity should relieve against it."

place to go, I'll come back and I will try but I will be watching every move you make and you know that I will.' I said, 'You are to stay away from Beverly, you are to treat Clark [a son] right and I will do my part, I will make you a wife if you will let me.' He said, 'I know we have never been man and wife but we will this time, I'll do anything for you if you will come back,' so I went back.

***

"He immediately demanded I start sleeping with him and I told him I couldn't, every time I look at you, I know you know that I know what you have done. I said, 'when I look at you I think of that and I can't respect you and I can't respect you and I can't sleep with you until I respect you. You've got to take me back on them terms', and he said he would. I said that maybe later on I could grow to feel like I did at first, that I would want you as a husband. He said, 'I will stay with you under any circumstances.'"

Further, quoting from an Oklahoma case,[7] we added:

"The majority of cases between man and wife where questions arising out of constructive fraud, undue influence, or a violation of confidence reposed are involved are generally those wherein the wife sues to secure relief from contracts, gifts, and transactions entered into under the influence of the husband; the cases quoted from above, however, and some others cited are those where the husband was the victim. The principle controlling the rule for relief under either situation is the same. It is that influence has been acquired and abused; confidence reposed and betrayed. It is of no consequence that the one deceived is a man, and the other party a woman. Difference in sex does not create the equities, nor alter the rule. It is the confidential relationship existing between the parties and the fact that the acts done spring from it which create the equities. In the case at bar it appears that the sole consideration for the transfer of this property from the husband to the wife was the affection and confidence which he had in her as his wife. She was not a stranger to him, nor did she pay him any valuable consideration for the property. As he doubtless viewed it, their relationship made them virtually one person, and it was probably a matter of indifference to him whether the title to the property was in her or himself. They were to jointly use it as a continuing, harmonious family. He did not give it to her, nor did she receive it, in contemplation of divorce and separation; the transaction had its life and being in the sacred relationship of husband and wife. Without this it would never have taken place."

In its Finding No. 5, the court stated:

"The court finds that Rosemary deliberately induced Mr. Lockley to place the title to the Cross County property in their names as tenants by the entirety, with the knowledge that she did intend [8] to continue to live

---

[7]*Thomas* v. *Thomas*, 27 Okla. 784, 109 Pac. 825.

[8]It is not clear from this language whether the court meant that Lockley changed the title because he thought his wife intended to continue to live with him, or whether the language has reference to Mrs. Lockley. If the latter is true, it is obvious from the findings in the case that the sentence "That she did intend" was a mistake and meant "that she did *not* intend".

with him as man and wife. The court further finds that the same state of affairs is true as to the home in Michigan. Rosemary should not be permitted to profit by these unconscionable actions. Therefore, the court finds that the deed from Mr. Lockley to himself and Rosemary will be set aside."

A circumstance that seems indeed pertinent in determining this litigation is that appellant agreed to go back to Lockley, even though her daughter told her that he had made improper sexual advances to her; still further, appellant testified that appellee had abused her (appellant) sexually, stating that he "mutilated" her. Now, if these things had happened, particularly the former, the love of a parent for a child being what it is, it is difficult to see how appellant could have resumed her relationship with appellee, and the fact that she subsequently left him a third time permanently, within three weeks after this deed was executed, is a potent circumstance indicative of the fact that she set out to acquire whatever property rights could be cajoled out of Mr. Lockley. We find no error in the ruling as to the Cross County property.

"II.

THE TRIAL COURT ERRED IN ENTERING AN IN REM ORDER OPERATING DIRECTLY UPON THE TITLE TO LANDS LYING IN THE STATE OF MICHIGAN BY REFORMING A DEED VESTING TITLE IN APPELLEE-HUSBAND ALONE OR IN GIVING HIM A LIEN AGAINST SUCH PROPERTY LOCATED IN THE STATE OF MICHIGAN."

The facts leading to the purchase of the property in Michigan are pretty well covered in the discussion under the preceding point. At the same time that Mr. Lockley was endeavoring to persuade appellant to return to him and discussed with his wife the Cross County property, he also agreed to purchase property in Leslie, Michigan. Appellant stated that Lockley told her he knew what it would take to make her happy, and that would be to return to Michigan;

that they went to Leslie, Michigan for the purpose of buying a home. She said that appellee had never been in Michigan except when he drove there to get her and take her back to Arkansas. The two looked at a house, liked it, and made the purchase for the sum of $34,000 which was drawn from Mr. Lockley's bank accounts. This purchase took place on June 15, 1973, and the parties after staying there for a day or two, returned to Arkansas.

Lockley stated that his wife wanted to buy property in Michigan since some of her children were going to school there, and that she said they would live there for about three years until the children were out of school and that they would then return to Arkansas to live. Lockley said that he believed her and they made the trip, found the property that she liked and purchased it as she desired, i.e., "She wanted it in mine and her name and I put it there." While, as previously stated, this record is most confusing, it does appear that they stayed in Michigan for one or two nights, returned to Arkansas and, according to Lockley, appellant left the day after they arrived in Arkansas. At any rate, only a few days elapsed. Again, we do not find, for the same reasons enumerated under the preceding point, that the chancellor's finding should be overturned. However, the court erred in its disposition of the property. The finding was as follows:

> "The court finds that, from an equitable standpoint, title to the home in Michigan is vested in Mr. Lockley alone, and the deed to it should be reformed to that effect. In the alternative, if this cannot be accomplished, then Mr. Lockley is given a lien against the Michigan home in dollars to the full extent of the purchase price."

This transfer of title cannot be accomplished under the method employed by the chancery court. As stated by Dr. Robert A. Leflar, distinguished professor of law, in American Conflicts Law, § 173, p. 427:

> "The only state which can, by operation of law and apart from the act of the parties, transfer title in land out of one person and into another is the state where the land lies."

In § 174, p. 428, it is stated:

"Although the courts of one state are without power to issue any judgment or decree directly affecting title to land in another state, it is permissible for them to issue in personam judgments and decrees in suits involving foreign land. *** The court's decree for the plaintiff is good so long as it merely orders the defendant to execute conveyance, and does not purport to pass the title in the extrastate land. The conveyance executed under the legal duress of such a decree is recognized as valid. A court's power to issue decrees for conveyance of foreign land is not limited to suits on contracts, but may be exercised in any case in which an in personam right to have conveyance is discoverable."

In our own case of *Tolley* v. *Tolley*, 210 Ark. 144, 194 S.W. 2d 687, the court held that a Kansas divorce decree awarding certain Arkansas realty to the wife involved an attempt by the Kansas court directly to adjudicate title to property outside the jurisdiction of Kansas, and was not effective in this state. The Kansas decree awarded the land to the wife, "free and clear of all claims and liens of the defendant." In discussing the case, this court said:

"The judgment of the District Court of Wyandotte county, Kansas, contained this language: 'It is further ordered and decreed that plaintiff be and she is hereby awarded the following described real estate, to-wit: The southeast quarter (¼) of the southeast quarter (¼) of section ten (10), township seven (7) north, range five (5) west, consisting of forty (40) acres of land, more or less, in White County, Arkansas, free and clear of all claims and liens of the defendant.' This was a decree *in rem* by the Kansas court, attempting to settle title to real estate in Arkansas by operating directly on the title. The full faith and credit clause of the United States Constitution does not afford any sanctity or force in the State of Arkansas to such judgment of the Kansas court, because the Kansas court was without jurisdiction to vest title to Arkansas real estate in the form in which this judgment was rendered. *Fall* v. *Eastin*, 215 U.S. 1, 30 S. Ct. 3, 54 L.

Ed. 65, 23 L.R.A., N.S., 924, 17 Ann. Cas. 853. In that case just cited, Mr. Justice McKenna, speaking for the United States Supreme Court, quoted from the earlier case of *Watts* v. *Waddle*, 6 Pet. 389, 8 L. Ed. 437: 'It is not in the power of one state to prescribe the mode by which real property shall be conveyed in another. This principle is too clear to admit of doubt.' In speaking of the full faith and credit clause, Mr. Justice McKenna said: 'This provision does not extend the jurisdiction of the courts of one state to property situated in another . . .' \*\*\*

"In 27 C.J.S. 1287 the rule is stated: 'since jurisdiction to render a judgment *in rem* inheres only in the courts of the state which is the situs of the *res,* a divorce decree which attempts to settle the title to lands in another state, by operating directly on the title, and not by compelling the holder of the title to convey, is void and not *res adjudicata* of the same claim in an action between the same parties and involving the same land.'

"And in 17 Am. Juris. 369 this appears: 'The rule is well established that in divorce proceedings the courts of one state cannot, by their decree, directly affect the legal title to land situated in another state, . . .'

"And in Leflar on 'Conflict of Laws,' § 119, the rule is stated: 'The only state which can, by operation of law and apart from the act of the parties, transfer title in land out of one person and into another is the state where the land lies.'"

See also *Kendall* v. *Crenshaw,* 116 Ark. 427, 173 S.W. 393. In the Michigan case of *Parkinson* v. *Guilloz,* et al, 231 N.W. 89, the Supreme Court of Michigan said:

"The evidence consisted of plaintiff's testimony, taken by deposition, and the introduction of records and opinions of the California courts, which are claimed to be res adjudicata. In Guilloz v. Parkinson, 204 Cal. 441, 268 P. 635, the court held that plaintiff did not hold the lots in trust for defendant. The decision authorized a

personal decree, but expressly recognized that the title to the lots was determinable only by the courts of this state. The decision is not res adjudicata here."

Here, Mrs. Lockley was not directed to execute a deed to Mr. Lockley conveying the Michigan property; rather, the court itself divested Mrs. Lockley of title, and it was without authority to do so. Of course, the alternative set out by the court was also beyond its authority. It follows that this portion of the decree will have to be reversed.

"III.

THE DIVORCE GRANTED TO APPELLEE-HUSBAND ON HIS COMPLAINT IS NOT SUPPORTED BY A PREPONDERANCE OF THE EVIDENCE."

The trial court found as follows:

"3. The court finds that a divorce should be awarded to Mr. Lockley on the grounds of indignities. While the corroboration of Mr. Lockley's testimony is rather slight, this court cannot be blind to the circumstantial evidence set out above. When all of the testimony of all of the witnesses, including Rosemary herself, is put together with the actual facts and circumstances, this court must conclude that Mr. Lockley is entitled to a divorce.

"4. The court rejects the charges made by Rosemary against Mr. Lockley."

We agree that the corroborating evidence offered by Mr. Lockley was slight,[9] but we are also of the opinion that considering the findings of the court, and the circumstances reflected by the evidence, we cannot say that his decision in

---

[9]One rather puzzling fact was not developed. The evidence reflects that Mr. Beegle, the former husband of appellant, stayed in the same house with Mrs. Lockley overnight (in the home of appellant's sister), though not in the same room, but there is no evidence of any illicit conduct. There is no explanation of why Mr. Beegle was in Arkansas. The record indicates that this occurred after appellant left the Lockley home for the second time.

granting a divorce was erroneous. Of course, we have said numerous times, so numerous as to require no citation of authority, that corroboration in contested divorces need only be slight. What are the circumstances in the present case? First, let it be pointed out that the court specifically rejected the charges made by appellant against appellee. Let it be remembered that the chancellor heard and saw all of these witnesses, an advantage we did not have, and his rejection of the accusations made by Mrs. Lockley is quite significant, for if the charge made by appellant to Mr. Lockley that he was making improper advances to her daughter was not true, this was an extreme indignity that would "cut to the quick". That we consider there was excellent reason for the chancellor to disbelieve this testimony, has already been indicated in our earlier discussion pointing out that it is unusual for a woman to return to her husband if such abuse of a child has taken place. Strongly indicating her feelings toward this husband, even though she returned to his abode, was her statement in court, "I would have rather been dead than live with him." Of course, we daresay most any husband denied the conjugal relationship, would consider this a gross indignity. Her testimony, throughout the evidence definitely leaves the impression that she looked upon him with loathing, and held him in complete contempt. Of course, leaving him, and returning soon thereafter, as well as instituting suit against him, were indignities if there was no just cause for the leaving and the institution of the suit. The fact that she returned on these occasions, and dismissed her complaint, denotes that these actions were perhaps not justified. At any rate, we are unable to say that the chancellor's findings were against the preponderance of the evidence on this point.

"IV.

THE TRIAL COURT ERRED IN REFUSING TO GRANT APPELLANT-WIFE A DIVORCE ON HER COUNTERCLAIM."

Of course, under the finding in Point III, there is really no need to discuss this contention, for if Mr. Lockley was entitled to a divorce because of indignities, it necessarily follows that Mrs. Lockley was not so entitled. Beverly Beegle, the

daughter, sustained her Mother's allegations to a degree, stating that Lockley pinched her between the legs and on her breast, and that he had put his hands under her blouse touching her breasts. It has already been pointed out that the court did not accept testimony relative to this charge and we certainly cannot say, from the printed record, that it should have been accepted. Of course, though denying the divorce, the court did find:

> "Mr. Lockley did marry Rosemary, although foolishly, and she did live with him for a short time. Therefore, he should not be permitted to escape unscathed. Therefore, the court will permit Rosemary to retain the automobile, and any household belongings purchased while they were married which are presently in her possession. Any belongings which she took with her which belonged to Mr. Lockley and/or his former wife should be returned to Mr. Lockley. In addition, Mr. Lockley will be ordered to pay Rosemary the sum of $5,000.00 in cash."

For the reasons set forth under Point II, that portion of the decree is reversed and the cause remanded for further orders or proceedings; furthermore, because of our reversal on this point, the chancellor may, if he deems it proper, reconsider the distribution of assets.

It is so ordered.